[No. 18127. In Bank.—March 29, 1894.]

## MODOC LAND AND LIVE STOCK COMPANY et al., Appellants, *v.* STEPHEN BOOTH et al., Defendants, H. G. PAYNE, Respondent.

Riparian Rights—Injunction Against Nonriparian Owner—Harmless Diversion.—A riparian owner cannot enjoin the diversion of water above him on the stream by a nonriparian owner, when the amount diverted would not be used by him, and would cause no loss or injury to him or to his land; nor when he fails to make out his right in equity, and to show an injury for which money damages will not give him adequate compensation.

Appeal from a judgment of the Superior Court of Modoc County.

The facts are stated in the opinion.

*D. W. Jenks*, for Appellants.

Plaintiffs, as riparian owners, are entitled to have the stream flow in its natural channel, undiminished and unobstructed. (*Ferrea* v. *Knipe*, 28 Cal. 340; 87 Am.

Dec. 128; *Lux* v. *Haggin,* 69 Cal. 255; *Stanford* v. *Felt,* 71
Cal. 249; *Gould* v. *Stafford,* 77 Cal. 66; *American Company* v. *Bradford,* 27 Cal. 361; *Moore* v. *Water Works,*
68 Cal. 146; *Heilbron* v. *Canal Co.,* 75 Cal. 431; 7 Am.
St. Rep. 183.)

*Goodwin & Goodwin,* and *J. H. Stewart,* for Respondent.

It appears that during June, July, and August each
year plaintiffs incur large expense to divert the waters
from their riparian lands, and such expense is necessary
to the utility of their land.   Equity will not permit
this extraordinary remedy against defendants for those
months.   (*Edgar* v. *Stevenson,* 70 Cal. 290; *Heilbron* v.
*Land and Water Co.,* 80 Cal. 194.)

Belcher, C.—The plaintiffs brought this action to
obtain a perpetual injunction restraining the defendants,
fourteen in number, from diverting any of the waters
of the South Fork of Pitt river or its tributaries.

The case was submitted for decision in the court below
upon an agreed statement of the facts, which are in substance as follows:

The plaintiffs own, in severalty, tracts of land in
Modoc county aggregating fourteen thousand three hundred and eighty-two acres.   The tracts are contiguous,
and extend along and on both sides of the South Fork
of Pitt river a distance of about twelve miles, with a width
of from one to three miles.   About ten thousand acres
of the land are of the class known as swamp and over-
flowed land, and the title thereto was acquired under
the state laws providing for the sale of such lands.   The
balance is high land, and the title to about one-half of
it was acquired from the United States under the Desert
Land Act, and to the other half under the homestead
and pre-emption laws.

The South Fork of Pitt river heads in the mountains
about twenty miles east of the plaintiffs' lands, and is
fed by several tributary creeks, which unite with it before it reaches their lands.   The channel of the river

across the plaintiffs' lands has an average width of
thirty feet, a depth of five feet, and a grade of three and
one-half feet to the mile, but from where it leaves their
lands, for a distance of about four miles, its grade is not
more than three feet to the mile. Where the stream
enters the plaintiffs' lands it carries, in ordinary sea-
sons, on the 1st of July, not less than two thousand
inches of water, measured under a four-inch pressure,
and further down on their lands another tributary creek
joins it, which carries, in ordinary seasons, on the 1st
of July, three hundred inches of water, measured as
aforesaid.

When the plaintiffs and their grantors located their
swamp and overflowed lands the waters of the river
periodically overflowed its banks, during the spring and
early summer up to the middle of June of each year,
and covered said swamp-land tracts from one inch to
two feet in depth, and portions of the same then were,
and from time immemorial had been, a tule swamp, and
wholly unfit for cultivation or the growth of valuable
grasses. To reclaim the said swamp lands and make
them productive grass lands, plaintiffs and their grant-
ors had spent large sums of money in controlling the
waters of the stream upon them and in draining them;
and in order to utilize the lands and make them pro-
duce grasses, or any crop of value, and to harvest the
same, it is necessary for the plaintiffs to control the
flow of said waters so as to prevent them from overflow-
ing said lands during the haying season, which usually
occupies the months of July and August of each year,
and to that end to maintain extensive diverting and
draining works on and around said swamp lands to keep
the water from so naturally overflowing the same.

The lands described in the complaint, which were
acquired from the government as " desert lands," were
reclaimed from their desert character by the plaintiffs
or their grantors by diverting upon the same from
points above said lands portions of the waters of said
river, and the amounts at different times so diverted for

such purposes aggregate fourteen hundred inches, measured under a four-inch pressure.

By the means used, plaintiffs have reclaimed most of their swamp lands, and those lands now require more irrigation than other lands in that vicinity. In the year 1889 at least one-fourth of the lands of the corporation plaintiff were too dry to produce a crop.

Plaintiffs own about seven thousand head of cattle and other livestock, and they use their lands for raising hay to feed their animals during the winter season, and for pasturage during the late summer, fall, and winter months; and their animals are dependent upon the grass and herbage which grow upon said lands for food and maintenance, and upon the said stream for water to drink, while depasturing upon said lands.

In June, 1886, the defendants, H. G. Payne and Carlos Payne, owned certain tracts of land which were not watered by any natural stream, and were not riparian to Pitt river. In order to procure water for the irrigation of their land and for their stock and domestic purposes thereon, they, in the month named, entered upon Mill creek, one of the tributaries of the said river, and about fifteen and one-half miles above the uppermost part of the plaintiffs' land, and posted a notice in the form and manner required by law, claiming two hundred inches of the waters of the creek, to be conveyed thence by ditch to their said lands for irrigation and other uses thereon. The notice was duly recorded, and thereafter they constructed the ditch, and in 1887 diverted the waters of the creek through the same to the extent claimed, and used them during June, July, August, and September; and the use of two hundred inches of water on their lands was necessary. In making the diversion it was understood and agreed between them that H. G. Payne should own and use three-fourths of the said water, and Carlos Payne one-fourth.

In 1887 one of the plaintiffs, Flournoy, on behalf of his brother, who is not made a party to the action, posted a notice on Mill creek, a few rods below the head

of the Payne ditch, claiming in due form six hundred inches of the water of the. creek, to be conveyed away from the creek to lands belonging to his brother, and which were not riparian, and thereafter he, as the agent of his brother, constructed a ditch from the point on the creek where this notice was posted, and since then, as such agent, has diverted and used at times during 1888, 1889, and 1890 a large amount of the waters of said stream.

At divers times within five years before the commencement of this action the defendants, other than the Paynes, entered upon the natural channels of said river and its tributaries, and at sundry points above plaintiffs' lands placed dams therein and dug and constructed ditches, connected with said dams and leading out from said natural channels and away from the same, and by means of said dams and ditches have diverted from the streams large quantities of water which but for such diversions would have flowed to, upon, and across plaintffs' lands.

After this action was commenced the defendant, Carlos Payne, by an instrument in writing, remised, released, and quitclaimed to the plaintiffs all his right, title, interest, and claim in and to the flow and use of, and right to divert, any portion of the waters of said river, particularly Mill creek, saving and excepting Fitzhugh creek, and thereupon plaintiffs dismissed .the action as to him.

The defendants, McGahey and Fitzgerald, also, by an instrument in writing, remised, released, and quitclaimed to the plaintiffs all their right to the use of any water that might be diverted from East creek at the point described in the complaint as their point of diversion, save and except twenty-five inches, and thereupon plaintiffs dismissed the action as to them.

The defendant, Booth, also, by an instrument in writing, remised, released, and quitclaimed to the plaintiffs all his right to use water from the said river, save and except twenty inches measured under a four-inch pres-

sure, and thereupon plaintiffs dismissed the action as to him.

Plaintiffs stipulated with the defendants, Duke, Williams, Gaustad, and Harvey, that judgment should be entered to the effect that they should not divert any water from the South Fork of Pitt river at any time when the stream is at its usual and ordinary flow within its banks, provided such water is demanded by plaintiffs for the necessary use of any of them.

Plaintiffs also stipulated with defendant Todd that the decree should allow him the use at all times of twenty-five inches of water, measured under a four-inch pressure, upon his land, and also the right to make a reasonable use upon his land of all overflow, flood, and surplus waters flowing in said river.

The defendants Cantrall disclaimed any interest in the waters of the said river or its tributaries, save and except the surplus above the natural and ordinary flow of the stream and certain storage water mentioned in their disclaimer.

Upon these facts the court gave judgment that the plaintiffs take nothing as against the defendant H. G. Payne, and from that judgment they have appealed upon the judgment-roll.

The only point made for a reversal is that the court erred in not granting an injunction against the respondent, because appellants were riparian owners and as such "entitled to have the stream flow in its natural channel, undiminished and unobstructed."

In a state like this, where irrigation is greatly needed, and where large areas of land are comparatively worthless unless artificially irrigated, it is difficult to lay down a rule as to riparian rights which will be applicable to and cover all cases. It seems clear, however, that in no case should a riparian owner be permitted to demand, as of right, the intervention of a court of equity to restrain all persons who are not riparian owners from diverting any water from the stream at points above him, simply because he wishes to see the stream flow by or through his

land undiminished and unobstructed. In other words, a riparian owner ought not to be permitted to invoke the power of a court of equity to restrain the diversion of water above him by a nonriparian owner, when the amount diverted would not be used by him, and would cause no loss or injury to him or his land, present or prospective, but would greatly benefit the party diverting it. If this be not so, it would follow, for example, that an owner of land bordering on the Sacramento river in Yolo county could demand an injunction restraining the diversion of any water from that river for use in irrigating nonriparian lands in Glenn or Colusa county. And yet no one, probably, would expect such an injunction, if asked for, to be granted, or, if granted, to be sustained.

In *Edgar* v. *Stevenson*, 70 Cal. 286, it was held that a riparian proprietor, who has appropriated and uses all the water of a stream crossing his land, as it ordinarily flows, cannot restrain the diversion, during times of extraordinary high water, of the surplus not used or appropriated by him. And this case was referred to approvingly in *Heilbron* v. *Land and Water Co.*, 80 Cal. 189. In Black's Pomeroy on Water Rights, section 75, it is said: "Unless the flow of a stream to the land of a riparian proprietor has been appreciably or perceptibly diminished, he is not entitled to an injunction against another for wrongfully diverting water from the stream." And in *Lux* v. *Haggin*, 69 Cal. 284, it is said: "Under our codes the riparian proprietor is not required to establish his right at law by recovering a judgment in damages before applying for an injunction. The decisions (in cases of alleged nuisances) based on the failure of the complainant to have had his right established at law have no appositeness here. Here the plaintiff must indeed make out his right in equity, and show that money damages will not give him adequate compensation. If he fail to do this, relief in equity will be denied."

Under the law, as thus declared, were the appellants entitled to an injunction against the respondent? We

do not think they were. During the months of June, July, August, and September, when respondent used the small quantity of water appropriated by him, the full flow would have worked an injury rather than a benefit to appellants, and they sought to avoid the injury by maintaining extensive diverting and draining works on and around their swamp lands so as to keep them from being overflowed, and by turning the water off upon their highlands and permitting others to turn it off upon their lands.

It is true that it is stated that in the year 1889 at least one-fourth of the lands of the corporation plaintiff were too dry to produce a crop, but what particular lands were referred to, and why they were too dry, does not appear. They may have been, so far as shown by the record, chiefly its high lands, and the necessary steps to irrigate them during that year may not have been taken.

Looking at the whole record we conclude, therefore, that there was no error in the action of the court, and that the judgment appealed from should be affirmed.

Searls, C., and Vanclief, C., concurred.

For the reasons given in the foregoing opinion the judgment is affirmed.  De Haven, J.,  Harrison, J., Garoutte, J.;  Fitzgerald, J.

McFarland, J., dissented.