[Sac. No. 4526. In Bank.—January 31, 1935.]

GEORGE L. PEABODY et al., Respondents, v. CITY OF VALLEJO (a Municipal Corporation), Appellant.

354

Russell F. O'Hara, Athearn, Chandler & Farmer and Frank R. Devlin for Appellant.

Thos. J. Straub, W. R. Dunn, Hankins & Hankins, Thomas C. Boone, A. L. Cowell, Albert J. Lee, John J. O'Toole, City Attorney (San Francisco), Dion R. Holm, Assistant City Attorney, J. Leroy Johnson, City Attorney (Stockton),

Hugh Bradford, City Attorney (Sacramento), Harold P. Huls, City Attorney (Pasadena), John W. Holmes, Deputy City Attorney, W. G. Irving, Special Counsel, C. L. Byers, City Attorney (San Diego), T. B. Cosgrove, Special Counsel (Los Angeles and San Diego), J. F. Goux, City Attorney (Santa Barbara), W. G. Irving and Heaney, Price & Postel, Special Counsel, Bernard Brennan, City Attorney (Glendale), W. G. Irving, Special Counsel, Ralph W. Swagler, City Attorney (Burbank), W. G. Irving, Special Counsel, M. A. Fitzgerald, City Attorney (San Luis Obispo), T. P. Wittschen, L. W. Irving, U. S. Webb, Attorney-General, C. C. Carleton, Spencer Burroughs and Henry Holsinger, as *Amici Curiae* on Behalf of Appellant.

Kenneth Jones, City Attorney (Suisun), W. U. Goodman, Joseph M. Raines, Hadsell, Sweet, Ingalls & Lamb, Dan Hadsell, C. L. Josephson, Theodore W. Chester and Robbins & Van Fleet for Respondents.

Robert M. Searls, Glenn West, Russell Scott, City Attorney (Salinas), Arnold Rumwell, City Attorney (Palo Alto), W. U. Goodman, City Attorney (Fairfield), Loyd E. Hewitt, City Attorney (Yuba City), Frederick J. Heid, Jr., City Attorney (Tulare), R. T. Walters, City Attorney (Whittier), Eugene Best, City Attorney (Riverside), Hurley T. Bailey, City Attorney (Santa Maria), Clyde C. Downing, City Attorney (Santa Ana), Chas. F. Blackstock, City Attorney (Oxnard), Nowland M. Reid, City Attorney (Long Beach), Arthur H. Blanchard, City Attorney (Santa Paula), Ralph K. Pierson, City Attorney (Compton), H. L. Dearing, City Attorney (Orange), and N. D. Thomas, City Attorney (Davis), as *Amici. Curiae* on Behalf of Respondents.

SHENK, J.—This is an appeal from a judgment permanently enjoining the defendant, City of Vallejo, as an appropriator, from storing any of the waters of Gordon Valley Creek. The operation of the injunction was stayed upon certain conditions pending a determination of the appeal.

Gordon Valley Creek and Wooden Valley Creek have their sources in separate watersheds in Napa County and

flow southerly to their junction in the southern portion of said county. From this point of confluence the stream is known as Suisun Creek, which flows southerly through Suisun Valley in Solano County and empties into the tidal sloughs connected with Suisun Bay a short distance west of the town of Suisun. Except for a short distance near its mouth the channel of Suisun Creek is narrow and deep. Almost paralleling Suisun Creek on the easterly side is Ledgewood Creek, which rises in Napa County and empties into the bay near the town of Suisun.

In July, 1920, the defendant, City of Vallejo, applied to the division of water rights of this state for a permit to store 37,000 acre feet of water in Gordon Valley. In 1921 the application was amended to limit the storage to 10,000 acre feet. After investigation by the division of water rights and a hearing at which some fifty users of water in the Suisun Creek area filed protests against the application, a permit was granted to the defendant city authorizing it to store waters of Gordon Valley Creek not in excess of 10,000 acre feet in any one year, and to divert said stored waters to the City of Vallejo not in excess of 5058.9 acre feet annually. In pursuance of said permit the city constructed a dam in Gordon Valley on Gordon Valley Creek, about three miles above its confluence with Wooden Valley Creek. This dam was completed in December, 1925, and the reservoir formed by it has been in operation since that date. The capacity of the reservoir is 10,000 acre feet. In excess of one million dollars was expended in the construction of the dam and reservoir and the pipe line conveying water therefrom to the City of Vallejo.

Gordon Valley Creek is a small mountain stream about five miles in length from its source to the dam of the defendant. Its watershed is of a decidedly precipitous nature and its area above the dam is seventeen square miles. The combined watershed of Wooden Valley Creek and of Gordon Valley Creek below the dam is twenty-two square miles. The watershed of Suisun Creek below the confluence of its tributaries is seventeen square miles. The watershed of Ledgewood Creek is twenty-seven square miles. The waters of these streams are not fed from melting snows. The rainfall is practically the same for the mountain or upper area and the valley or lower area. The records for a period

of seventy years from 1849 to 1921 show a normal rainfall of 31.0 inches on the upper watershed and 29.01 on the lower watershed. The average annual rainfall for thirty-four years prior to 1921 was 25,5 inches. In the season 1923–24, an exceptional year of drought, the rainfall was 12.2 inches. The records disclose that the average annual rainfall in the watershed and valley for at least eighty years has been in excess of twenty-five inches. The first substantial rainfall begins in October or November and continues well into the month of April of the following year.

A gauging station (No. 1) is maintained at a point just below the dam, and another (No. 4), near the railroad crossing at the lower end or outlet of Suisun Creek. The record shows the amount of the flow in acre feet at the respective stations from.1920–21 to 1926–27 to have been as follows: Season 1920–21, No. 1, 6115; No. 4, 16,382. Season 1921–22, No. 1, 3392; No. 4, 8844. Season 1922–23, No. 1, 3942; No. 4, 11,176. Season 1923–24, No. 1, 249; No. 4, 101. Season 1924–25, No. 1, 2996; No. 4, 5973. Season 1925–26, No. 1, 6908; No. 4, 13,503. Season 1926–27, No. 4, 13,700, up to March 31, 1927, when, during a storm, the lower station was washed out. From the time of the completion of the dam in December, 1925, to March 31, 1927, the entire flow of Gordon Valley Creek above the dam was stored in the reservoir. The foregoing record of the creek flow as shown at the gauging stations is in substantial corroboration of the conclusions of the plaintiffs' main engineering expert that Gordon Valley Creek above the dam contributed to the flow of Suisun Creek in proportion to the respective watersheds, viz., 17/49, or about 35 per cent. This record is also a demonstration' that, even eliminating the diminution in 1925–26 and 1926–27 due to storage, a tremendous volume of water passed on to the bay. Due to the gradient and the flashiness of the streams this water rushed in great velocity from the upper regions to the lowlands and into the bay.

The plaintiffs are riparian owners on Suisun Creek. They commenced this action on October 13, 1926. In their complaint they described the riparian nature of their lands and the orchards, vineyards and products grown thereon. They alleged that Suisun Valley is a detritus cone formed by Suisun Creek and its said tributaries; that they use the

waters of Suisun Creek for irrigation and other beneficial uses; that all of the water of the creek is needed for these purposes, and that the defendant's project will permanently injure their water supply. The answer, with certain exceptions not necessary to be noted, denied all of the allegations of the complaint. As a part of a special defense, the defendant alleged that on Gordon Valley Creek above its dam there occur at irregular times and intervals unusual and heavy rainstorms; that no one can tell when such rainstorms will occur, nor the extent thereof, nor how long such storms will last; that when said rainstorms occur the waters of Gordon Valley Creek rise very rapidly within a few hours and become storm and freshet waters of great volume; that said waters flow down into Suisun Creek and from there into San Francisco Bay with great rapidity and are forever lost; that said storm and freshet waters are of no benefit whatever to the lands of the plaintiffs; that the ordinary and normal flow of Suisun Creek is three second feet from December to February and one second foot in March and April; and that the defendant desires to impound only the waters in excess of this normal flow.

One of the principal issues at the trial was whether there were any extraordinary flood waters in Gordon Valley Creek, and whether any of the waters flowing in that stream during period of high flow were being put to a beneficial use by the plaintiffs. The trial court found that Suisun Creek is a rather narrow and winding stream with a considerable gradient; that during certain periods of the year large quantities of water flow therein with considerable velocity; that rainfall in the watersheds of Suisun Creek begins usually in October and continues to almost the first of May of the next year; that the water begins to flow earlier and continues to flow later in Gordon Valley Creek than in Wooden Valley Creek; that the flows in the three streams vary from a few second feet to hundreds of second feet, depending upon the rainfall; that during the months when rainfall usually occurs, there are usually from three to five heavy rainstorms on the watersheds of Suisun Creek and its tributaries; that when these heavy rains will occur is not known with exactness, nor is it known with exactness how long they will endure or how much run-off they will produce, but it is the usual, ordinary and expected thing for these rainstorms

to occur during these months; that it would be and is unusual, extraordinary and unexpected if such rainstorms and accompanying flood, freshet and storm waters in Suisun Creek do not occur; that the watersheds of Suisun Creek and its tributaries are comparatively small and that the streams are comparatively short; that, in consequence thereof, the rainfall in said watersheds runs off with considerable rapidity, and that it is usual, ordinary and expected that the rainfall in said. watersheds runs off and will run off with considerable rapidity; that the run-off in Suisun Creek and its tributaries in considerable quantities always occurs during the rainstorms and for some days to several weeks thereafter; that all of the waters in Suisun Creek, including the waters flowing in the stream during peak flows, were being put to a beneficial use by the plaintiffs, and that the impounding of any portion of these waters by the defendant would result in material and substantial damage to the plaintiffs; that all of the waters of Gordon Valley Creek are part of the usual, ordinary and expected flow, and are beneficially useful to the plaintiffs; that if at any time any unusual, unexpected or extraordinary waters do flow in Gordon Valley Creek, all thereof will be and are beneficially useful to the plaintiffs; that the plaintiffs are entitled to have all of the waters that run off Gordon Valley watershed accumulate in Gordon Valley Creek as in the course of nature without interference by the defendant.

With particularity the court found the ownership in the several plaintiffs of lands in the Suisun Valley and the uses to which the waters of Suisun Creek had been put by them. As to the plaintiff Peabody the court found that the natural mouth of the creek is upon his lands, the lower portions of which were salt marsh lands at about sea level; that the waters of the creek by nature flowed in all directions over, along, across, about and upon said lands. The evidence further shows that this plaintiff has guided the waters of the creek on to the bay by the construction of artificial channels and has diked against the flow at certain places. He has built levees along the south side of his lands to keep the waters from overflowing them. He claims a benefit from the overflow by deposits of silt on his lands and by the washing of salt out of a portion thereof, as well as saturation from the overflow of the waters of the creek.

Other plaintiffs claim a benefit by reason of seepage into their land of waters of the creek at the normal flow as well as from the storm or freshet flow. Some claim a benefit from overflow of storm water which leaves the channel, passes over their land, never to return, but thereby further saturating their lands and depositing silt thereon. Other plaintiffs are required to levee against the storm waters in times of heavy rainstorms. Still others farther up the valley base their claims on the right to the maintenance of the underground water table to serve wells constructed on their property.

It is unnecessary to recount in further detail the findings and evidence with respect to the lands of the several plaintiffs. The defendant contends that the findings and conclusions of the trial court are unsupported by the evidence on any proper theory of the present law of this state. In this connection it may not be successfully questioned that the trial court's approach to the problem before it and the application of the law to the facts presented was on the theory that under the law in force when the judgment was entered the riparian owner was entitled to all of the waters of the stream as the same were wont to flow in the course of nature, including the flood and freshet flows thereof, regardless of any waste or surplus that might result from the exercise of such a right and regardless of any rule of reasonable use. It is clearly apparent, in fact not disputed, that the trial court applied to the facts in the case the doctrine of *Miller & Lux* v. *Madera Canal & Irr. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], and *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607], the opinion in the latter case having been filed after the present action was commenced but before the trial thereof. Going still further, the trial court found and concluded that even if there were any unusual or extraordinary flood waters passing down the stream they would be useful and beneficial to the plaintiffs. Throughout the proceeding the court disregarded the effect of the policy declared by the amendment of the Constitution adding section 3 to article XIV thereof. This amendment became effective in November, 1928. The present action was decided on June 28, 1929, and the findings and judgment then ordered. It is true that the effect of the constitutional amendment had not, prior to that time, been under review

by this court. But its declaration was plain and its history and purpose were well known. It was then within the province, in fact the duty, of the trial court to adhere to, and apply to the facts before it, the rule and policy declared in the constitutional amendment then in effect. (See *Funk* v. *United States*, 290 U. S. 371 [54 Sup. Ct. 212, 78 L. Ed. 369, 93 A. L. R. 1136].) Failing to do so it must be concluded that the trial court applied the wrong theory to the facts presented and to the prejudice of the defendant. In such case the judgment should be reversed (*Seneca Consolidated Gold Mines Co.* v. *Great Western Power Co.*, 209 Cal. 206 [287 Pac. 93, 70 A. L. R. 210]), and the cause be retried in accordance with the theory and policy of the constitutional mandate, for it is clear that if such a state policy had been applied to the facts, the present findings and judgment would not have been the result of the trial.

The conflicting views of opposing counsel and numerous *amici curiae* as to the effect of the constitutional amendment render it necessary to set forth certain general observations for the guidance of the court on a retrial. Counsel for the plaintiffs and *amici curiae* in that behalf stand their ground on the doctrine of *Miller & Lux* v. *Madera Canal & Irr. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772], *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607], and other cases claimed to be in approval thereof, and contend that the constitutional amendment has not materially modified that doctrine. Counsel for the defendant and supporting *amici curiae* contend for an extension of the doctrine of *Modoc L. & L. S. Co.* v. *Booth*, 102 Cal. 151 [36 Pac. 431]; *Fifield* v. *Spring Valley Water Works*, 130 Cal. 552 [62 Pac. 1054]; *Town of Antioch* v. *Williams Irr. Dist.*, 188 Cal. 451 [205 Pac. 688], and a further exposition of the effect of the constitutional amendment in line with *Gin S. Chow* v. *City of Santa Barbara*, 217 Cal. 673 [22 Pac. (2d) 5].

It is conceded by all parties that waters in the rivers and streams of the state which waste into the sea should, if possible, be conserved for beneficial uses. The question is as to how this result may be accomplished. The contentions of the parties are in a measure irreconcilable. On behalf of the plaintiffs it is urged that the riparian owner is

entitled to the full flow of the stream as it is wont to flow in the state of nature, without diminution, for any present or prospective beneficial uses, regardless of the reasonableness of such uses and regardless of waste or surplus which such uses might entail, and that any interference with that right is an infringement of a vested property right protected by the state and federal Constitutions. The defendant insists that the plaintiffs are entitled only to the ordinary, as distinguished from the flood or freshet flow of the stream and that any flood or storm waters which would otherwise flow on to the sea may be appropriated without any expense to the appropriator. Neither view reflects the present policy of the state with reference to the use of waters. Such policy must now be set at rest. Otherwise the protracted and expensive efforts of the state and other public authorities to conserve the unused waters of the state for beneficial purposes have been of little fruition. By the declaration of certain guiding principles the necessary result may be brought about. And this should be done with full recognition of the rights which the riparian owner may properly assert, but still place the law of the state in such condition that he may not, by assuming an arbitrary position, forestall by injunction proper programs of conservation, or assert such claims for compensation for any alleged infringement of his right as are fanciful and would be prohibitive.

As the subject is approached, it is readily apparent that it is for this court, which has largely created the water law of this state without constitutional direction, to cause the law to conform to the state policy now commanded by our fundamental law.

In adopting a policy modifying the long standing riparian doctrine of this state, California has done by constitutional amendment what many of the western states have done by statute or court decisions. Of the seventeen western states, generally referred to as the irrigation states, nine now recognize the modified doctrine of riparian rights and eight have entirely abrogated the doctrine of riparian rights and recognize only the doctrine of appropriation. The nine are North Dakoto, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Washington, Oregon and California; and the eight are Montana, Idaho, Wyoming, Ne-

vada, Utah, Colorado, Arizona and New Mexico. (Wiel on Water Rights, secs. 117, 118.) Mr. Wiel at the time properly listed Montana as a riparian state, but in 1921 it was held in *Mettler* v. *Ames Realty Co.*, 61 Mont. 152 [201 Pac. 702], that the doctrine of riparian rights was abrogated and that the doctrine of prior appropriation obtained exclusively in that state.

In further clarifying the new state policy we have no hesitancy in doing so without fear of infringing upon any provision of the federal Constitution. The attitude of the Supreme Court of the United States has been consistent in leaving the question of private water rights, which do not involve federal or interstate interests, to the control of local state policies. (*United States* v. *Rio Grande Dam & Irr. Co.*, 174 U. S. 690, 702, 703 [19 Sup. Ct. 770, 43 L. Ed. 1136]; *Hudson County Water Co.* .v. *McCarter*, 209 U. S. 349, 356 [28 Sup. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560]; *State of Connecticut* v. *Commonwealth of Massachusetts*, 282 U. S. 660, 670 [51 Sup. Ct. 286, 75 L. Ed. 602].)

 Section 3 of article XIV of the California Constitution, inserted as a new section by amendment in 1928, is as follows: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that noth-

ing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained.''

The rule of reasonableness of use as a measure of the water right has been applied by this court as between riparian owners (*Pabst* v. *Finmand,* 190 Cal. 124 [211 Pac. 11]); as between owners overlying an underground water supply (*Katz* v. *Walkinshaw,* 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236]); as between appropriators (*Natoma W. & M. Co.* v. *Hancock,* 101 Cal. 42 [31 Pac. 112, 35 Pac. 334]); as between overlying owners and exporters from an underground basin to nonoverlying lands (*Burr* v. *Maclay Rancho Water Co.,* 154 Cal. 428 [98 Pac. 260]); and as between riparian owners and overlying owners under the doctrine of common source of supply (*Hudson* v. *Dailey,* 156 Cal. 617 [105 Pac. 748]); but the court has denied its application as between a riparian owner and an appropriator. The constitutional amendment, from its effective date, and as interpreted in the Gin Chow case, has enjoined the doctrine of reasonable use as between the riparian owner and an appropriator. The limitations and prohibitions of the constitutional amendment now apply to every water right and every method of diversion. Epitomized, the amendment declares:

1. The right to the use of water is limited to such water as shall be reasonably required for the beneficial use to be served.

2. Such right does not extend to the waste of water.

3. Such right does not extend to unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

4. Riparian rights attach to, but to no more than so much of the flow as may be required or used consistently with this section of the Constitution.

The foregoing mandates are plain, they are positive, and admit of no exception. They apply to the use of all water, under whatever right the use may be enjoyed. The prob-

lem is to apply these rules in the varying circumstances of cases as they arise.

The waters of our streams are not like land which is static, can be measured and divided and the division remain the same. Water is constantly shifting, and the supply changes to some extent every day. A stream supply may be divided but the product of the division in nowise remains the same. When the supply is limited public interest requires that there be the greatest number of beneficial uses which the supply can yield.

The right to the waste of water is not now included in the riparian right. As to what is waste water depends on the circumstances of each case and the time when waste is required to be prevented. In sections of the state, few in number, where the rivers and streams are plentifully supplied, and there is no need for the conservation of the product thereof, the water flows freely to the sea. When needed for beneficial uses it may be stored or restrained by appropriation subject to the rights of those who have a lawful priority in a reasonable beneficial use. That priority has been subjected to limitations and regulations prescribed by the Constitution, but it has by no means been abolished. Under the new policy the vested right theory, that is, the right of the riparian owner to all of the waters of the stream, as it is wont to flow in the state of nature, and without regard to the reasonableness of such use as against an appropriator, has been subjected to such limitations that the old doctrine declared in *Miller & Lux* v. *Madera Canal & Irr. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], is no longer the law of this state. Also distinctions heretofore made between the unusual or extraordinary and the usual or ordinary flood and freshet waters of a stream are no longer applicable.

The problem now has three aspects: First, after excluding all of the reasonable beneficial uses present and prospective (considering in connection therewith reasonable methods of use and reasonable methods of diversion) to which the waters of the stream are put, either under the riparian right or by prior appropriation, is there then water wasted or unused or not put to any beneficial use? If so, the supply or product of the stream may be said to be ample for all, a surplus or excess exists, no injunction may

issue against the taking of such surplus or excess (*City of San Bernardino* v. *Riverside,* 186 Cal. 7, 20 [198 Pac. 784]), and the appropriator may take the surplus or excess without compensation.

Secondly, where all of the waters of the stream are put to reasonably beneficial uses under reasonable methods of use and reasonable methods of diversion and there is no unusual waste or surplus water to be captured, there is nothing left for appropriation. This is self-evident.

Thirdly, where, as the result of rainstorms and resulting floods, or of melting snows, or of natural flow otherwise, a large volume of water flows on to the sea, unused, wasted and lost, how may the same be conserved for useful and beneficial purposes, having due regard for the rights of riparian owners, prior appropriators and overlying land owners?

The answer to the last question involves many considerations, all of which cannot be disposed of under the facts of a single case and must be dealt with in connection with each case as it arises. As to the case at bar, the following conclusions would seem to be inescapable:

The asserted right of a riparian owner, whose lands in a state of nature form a delta at about sea level, to have the full flood flow of the stream to overflow his lands for the purpose of depositing silt thereon, or by artificial check dams and levees to remove the saline content of the soil which in a state of nature are salt marsh lands, cannot be supported. So far as we are advised, this asserted right does not inhere in the riparian right at common law, and as a natural right cannot be asserted as against the police power of the state in the conservation of its waters. This asserted right involves an unreasonable use or an unreasonable method of use or an unreasonable method of diversion of water as contemplated by the Constitution. This conclusion applies to much of the lands owned by the plaintiff Peabody.

The same conclusion applies also to the asserted right of other plaintiffs to have the flood and freshet waters which leave the natural channel of the stream, overflow their lands and never return to the channel. (See *Montecito Valley Water Co.* v. *Santa Barbara,* 144 Cal. 578, 588 [77 Pac. 1113].)

■ The asserted right of some of the plaintiffs to have the benefit of the full flow of the stream to maintain the underground and percolating water supply has been and is recognized as a "natural" right analogous to the riparian right, but subject to the limitations of the new state policy. The rule of the common law applicable to percolating waters gave to the owner of land all that lay beneath it, with the right to interrupt and take away waters passing by percolation to his neighbor's land. This rule was modified by the decision in *Katz* v. *Walkinshaw*, 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236], and the more reasonable doctrine of *sic utere tuo* was applied to percolating water rights. In *Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428 [98 Pac. 260], this court defined the rights of an overlying land owner who had purchased his land in reliance upon the underground supply as against an appropriator from the same supply for use on distant land, and said:

"The land being so situated that it has the natural advantages afforded by the underlying water, the conditions are analogous to those respecting land riparian to a stream, which, because of its situation with reference to the stream, is given rights to the waters thereof, so far as necessary for use thereon, which are paramount to the right of another riparian owner to divert the water to lands not riparian. The reasonable rule here would be to hold that the defendant's appropriation for distant lands is subject to the reasonable use of the water on lands overlying the supply, particularly in the hands of 'persons who have acquired it because of these natural advantages, and we therefore hold this to be the law of the case with respect to the lands upon which no water has been used by the plaintiff.

"In the case of either class of owners of overlying lands, the appropriator for use on distant land has the right to any surplus that may exist. If the adjoining land owner does not use the water, the appropriator may take all the regular supply to distant land until such land owner is prepared to use and begins to do so. It is not the policy of the law to permit any of the valuable waters of the country to remain unused, or to allow one having the natural advantage of a situation which gives him a legal right to water to prevent another from using it, while he,

himself, does not desire to do so. . . . The most that should be allowed in such circumstances is to give a party the aid of the courts to protect his right and prevent the destruction of his source of supply by excessive use or other cause. The court unquestionably has power to make reasonable regulations for the use of such water by the respective parties, fixing the times when each may take it and the quantity to be taken, provided they be adequate to protect the person having the paramount right in the substantial enjoyment of that right and to prevent its ultimate destruction.''

The foregoing declaration is in harmony with the present state policy which, however, has gone still further and extended the doctrine to reasonable use and reasonable methods of use and reasonable methods of diversion as between riparian owners and appropriators.

About two years after the Burr case this court decided *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772]. The plaintiffs herein place great reliance on the decision in the latter case. There the owner of land overlying and dependent upon an underground water supply sought to enjoin a diversion to foreign parts of *all* of the underlying and percolating waters of Coyote River. It was taken for granted that at common law the plaintiff's grievance would not be actionable, but the correlative rights doctrine declared in *Katz* v. *Walkinshaw,* 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236], was reaffirmed. It was held that, although the plaintiff was not strictly a riparian owner, he had shown a right analogous to the riparian right in that his lands had an advantage conferred by nature and entitled to protection as against a diversion of all of the underground waters beyond the watershed. By pleading and proof in the trial court the defendants contended that the plaintiff was not a riparian owner and had no right to prevent the diversion of the waters of the river, either surface, subsurface or percolating, and that the defendants had the right to divert all of such waters irrespective of any benefit afforded thereby to the plaintiff. On appeal, and confronted by adverse findings supported by the evidence, the defendants insisted that the trial court should have framed a decree adopting an artificial plan, not suggested at the trial, permitting them to store waters in the upper reaches of the

stream with appropriate provisions for a release of certain quantities of water for the protection of the plaintiffs and others similarly situated. There was a definite intimation in the opinion that if the defendants had, by pleading and proof in the trial court, sought the establishment of the rights insisted upon on appeal, including the right to store water which it was claimed would otherwise leave the basin and flow into San Francisco Bay, such relief might have been granted; but that under the circumstances disclosed by the record they were in no position to complain.

Furthermore, the Miller case recognizes that an appropriator may divert for use beyond the watershed any portion of the waters of the underground stream which can serve no useful purpose to overlying land owners. The rights of such owners and of those dependent upon the underground supply are paramount to the rights of appropriators for use on distant lands; but such paramount rights must be exercised in subordination to the new state policy.

Notwithstanding the common-law rule to the contrary, this court, in the cases referred to, accorded to the underlying and percolating water right a status analogous to the riparian right. The attitude of some of the plaintiffs herein in effect is that, possessing that status, they are entitled to have the underground waters flow and percolate as in a state of nature regardless of the quantity of the supply or the reasonableness of use. But since the riparian right as against an appropriator has by the new state policy been subjected to the doctrine of reasonable use, no good reason has been advanced why the asserted underground and percolating water right should not be subjected to the same regulation as against an appropriator. In whatever respects the Miller case, or any other case, may be said to hold otherwise, they must be deemed to yield to the new constitutional policy with reference to the use of the waters of the state.

In the case at bar there is no irrigation to any considerable extent directly from the open stream. Some of the plaintiffs who pump water from the underground water supply for irrigation on their lands have experienced no diminution of their supply since the defendant's reservoir was placed in operation. Others made a showing that the water table had receded since 1925, but the extent of the

damage to them by reason thereof was not attempted to be shown. Nor did it clearly appear just what damage would accrue to the lands of the plaintiffs by reason of impounding in the defendant's reservoir water from 35 per cent of the drainage area contributing to the underground supply normally tributary to the valley. The expert testimony on behalf of the plaintiffs as to the effect of the defendant's diversion on the percolating water supply, was that such diversion would have a tendency to cause the water plane to decline principally in dry years or during a series of dry years, but that no conclusion would be justified with respect to years of normal or more than normal rainfall. While the question as to the extent of the interference, if any, with the underground water rights of some of the plaintiffs by reason of the defendant's storage is necessarily involved in some speculation, the field is one for expert testimony based on established or ascertainable facts. On a retrial the influence, if any, of the defendant's storage for the last six years on the underground water supply will undoubtedly be susceptible of more definite admeasurement. One of the conditions of the judgment which stayed the injunction pending the appeal was that the defendant release from an outlet at the bottom of the dam a steady flow of five second feet of water, until the further order of the court. The effect of this artificial feeding of the underground waters, and the influence generally of the defendant's storage on the underground water table may be made a matter of proof in the light of experience since the judgment was entered.

In this connection it is appropriate to say that the decisions of this state have long since encouraged the impounding and distribution of unused and storm and flood waters. (*San Joaquin etc. Co.* v. *Fresno Flume & Irr. Co.,* 158 Cal. 626 [112 Pac. 182, 35 L. R. A. (N. S.) 832].) The fundamental law of the state now commands it when it can be done without substantial damage to the existing rights of others. This command is enjoined upon trial courts as well as upon the reviewing courts, and the former cannot avoid the responsibility of weighing the evidence in conformity with constitutional requirements and framing their decrees accordingly. This is especially true when the power of a court of equity is invoked to enjoin the economic use of the waters of the state. If the attitude of the

parties in a particular case be such as to embarrass the court in the proper determination of the case in view of a larger public interest involved and for the protection of all concerned, or for other sufficient reasons, the court might well invoke the aid of the division of water rights of the board of public works under section 24 of the Water Commission Act (Stats. 1931, p. 2421; Deering's General Laws, vol. 3, p. 5017) in the determination of the rights to water and the use of water in accordance with the constitutional policy. (See *Wood* v. *Pendola,* 1 Cal. (2d) 435 [35 Pac. (2d) 526].) The purpose of that state authority to safeguard rights in the use of water for domestic and agricultural purposes against a subsequent appropriator was evidenced in the case of *East Bay Municipal Utility District* v. *Department of Public Works,* 1 Cal. (2d) 476 [35 Pac. (2d) 1027]).

There is and should be no endeavor to take from a water right the protection to which it is justly entitled. The preferential and paramount rights of the riparian owner, the owner of an underground and percolating water right, and the prior appropriator are entitled to the protection of the courts at law or in equity. When there is no substantial infringement of the right, that is, when there is no material diminution of the supply by reason of the exercise of the subsequent right, the owner is entitled to a judgment declaring his preferential and paramount right and enjoining the assertion of an adverse use which might otherwise ripen into a prescriptive right. (*City of San Bernardino* v. *Riverside, supra.*) If the exercise of the appropriative right cause a substantial diminution of the supply the owner is entitled to compensation for the resulting damage to his lands. But the technical infringement of the right is not actionable (*Modoc L. & L. S. Co.* v. *Booth, supra; Holmes* v. *Snow Mountain W. & P. Co.,* 36 Cal. App. 394 [172 Pac. 178]; *Stratton* v. *Mt. Hermon Boys' School,* 216 Mass. 83 [103 N. E. 87, Ann. Cas. 1915A, 768, 49 L. R. A. (N. S.) 57]), except to establish priority. This is but another way of saying that the appropriator may use the stream surface or underground or percolating water, so long as the land having the paramount right is not materially damaged. Any use by an appropriator which causes substantial damage thereto, taking into consideration all of the present and reasonably prospective

recognized uses, is an impairment of the right for which compensation must be. made either in money or in kind, and in the event public use has not attached the owner of the paramount right is entitled to injunctive relief.

The problem in any case is to ascertain what portion of the product of the stream is subject to appropriation after all reasonable beneficial uses on the part of those having paramount rights have been enjoyed or safeguarded. It is suggested that the application of the doctrine of reasonable use of water lays the matter open to too much uncertainty. Conceding that the ascertainment of reasonable use is difficult it does not follow that it cannot be done. The requirements of public welfare demand that it be done, and the uncertainty ends when a definite application of the rule has been made to the facts in each case.

Some of the plaintiffs assert the right to the full flood and freshet flow of the stream to press water into their riparian lands as an aid in maintaining the level of the underground water supply. This is not strictly a riparian right at common law, but it cannot be said that under some circumstances such right is not a substantial right conferred by nature, to be enjoyed subject to the test of reasonable use. It would seem to be obvious that the use of an entire flood and freshet flow of a stream to press a small amount of water into adjoining lands would be an unreasonable use of the waters of the stream, especially when otherwise there is no appreciable lowering of the water table due to nature's processes or to artificial regulation of the stream flow. There is evidence in the present case that, because of the geological formation in the valley, Suisun Creek is not only a surface but a subsurface stream as well, the latter extending a considerable distance on either side of the trough through which the surface stream flows. In such a situation the riparian land owners and the overlying land owners may be said to possess a right to the stream, surface and subsurface, analogous to the riparian right, which should be protected against an unreasonable depletion by an appropriator. There is now no room for a distinction between the so-called pressure right and the overlying land owner's right, whether the latter be founded on a strictly percolating water right or a right in an underground stream. Each, however, is a paramount

right subject to the test of reasonable use. It was in evidence in this case that the flashy flows which pass below the Scarlett place serve no useful purpose for ground water replenishment. In such a situation only a technical interference with the asserted right is shown, and this would not support an injunction without conditions. The Scarlett place is about halfway between the dam and the Suisun branch of the Southern Pacific Railroad in the lower end of the valley. The extent to which the defendant's project interferes with the plaintiffs' natural ground water replenishment above the Scarlett place or elsewhere, to their substantial damage, will assumably be shown on a retrial. The defendant calls attention to the fact that since the dam was constructed and water impounded therein, and before that time, eleven out of twenty-five parcels of land involved showed no recession in the water plane. The recession in the remaining fourteen, variable in extent, has necessarily been only in part due to the impounding project, taking into consideration that but 35 per cent of the entire drainage area is contained in the Gordon Valley watershed above the dam. To require more than 13,000 acre feet of water to flow to the bay in order to make an insubstantial contribution to the underground supply of land bordering on the stream suggests the following comment of this court in *Town of Antioch* v. *Williams Irr. Dist.*, 188 Cal. 451, at page 461 [205 Pac. 688] : "It would be hard to conceive of a greater waste for so small a benefit."

 Relying further on the Antioch case the defendant contends that mere inconvenience or extra expense suffered by the overlying land owner would not justify an absolute injunction, nor require that damages for the interference with the right be paid. The claim is too broad. The correct rule is stated with its appropriate limitations in the italicized words in the following language of the District Court of Appeal in *Waterford Irr. Dist.* v. *Turlock Irr. Dist.* 50 Cal. App. 213, at page 221 [194 Pac. 757] : "The mere inconvenience, or even the matter of extra expense, *within limits which are not unreasonable,* to which a prior user may be subjected, will not avail to prevent a subsequent appropriator from utilizing his right." The further statement in the Antioch case that the city, by moving its pump a few miles up the river, could obtain water free from saline

solution, and therefore, inferentially, had no actionable grievance, should be considered in connection with the unusual factual background of that case and should not be taken as a guide as to the extent of inconvenience or damage to which the owner of a paramount right might be put without compensation. Here again we state that any interference with the prior right which would cause substantial damage is actionable.

As to the question of intervention of public use in this case: The defendant contends that public use had attached at the time of the commencement of this action and therefore the plaintiffs were not entitled to the injunction sought and granted to the extent of enjoining the defendant from impounding or diverting *any* of the waters of Gordon Valley Creek and of according to the plaintiff the right to have all of said waters continue to flow in the course of nature without any interference by the defendant. The defendant bases its contention on the undisputed facts that its reservoir was completed in December, 1925; that 6,908 acre feet of water were stored therein prior to May 1, 1926, and that this action was not commenced until October 13, 1926. In view of these facts it is urged that the utmost relief to which the plaintiffs were entitled was the ascertainment of whatever damage the operation of the defendant's project would result to the plaintiffs, and that a prohibitory injunction should not have been granted except as an aid in the enforcement of payment of damages.

When public interests are involved "a prohibitive injunction should be granted only if it shall appear that no other relief is adequate." (*Montecito Valley Water Co.* v. *Santa Barbara,* 144 Cal. 578 [77 Pac. 1113].) Again, with reference to the question of compensation in lieu of injunction, this court, in *Newport* v. *Temescal Water Co.,* 149 Cal. 531, at page 538 [87 Pac. 372, 6 L. R. A. (N. S.) 1098], said: "And, finally, upon this proposition it may be said that where the interests of the public are involved and the court can arrive in terms of money at the loss which plaintiff has sustained, an absolute injunction should not be granted, but an injunction conditional merely upon the failure of the defendant to make good the damage which results from its work. Such an action, if successful, should be regarded in its nature as the reverse of an

action in condemnation." This doctrine was definitely applied in *Collier* v. *Merced Irrigation Dist.*, 213 Cal. 554 [2 Pac. (2d) 790], wherein it was also held that when the public use intervened it attached to the reservoir's capacity within the limits of the defendant's permit. The plaintiffs attempt to meet the defendant's showing by urging that in any event the bar of the right to an injunction by the intervention of public use rests in estoppel, which must be, but it is claimed was not, pleaded, and even if pleaded would have been unavailing under the facts. The defendant alleged in its answer that the water impounded by means of said reservoir was then being distributed in the City of Vallejo for public purposes, and that it was neces-·sary that the city and its inhabitants continue to so use the same. This allegation was sufficient to raise the issue of intervention of public use; and on the trial it appeared beyond question, although apparently not seriously urged, that the public interest had intervened more than five months prior to the commencement of this action. The Collier case was not decided until 1931, but it was established by decisions of this court long prior to the trial that when public interests had intervened through the construction and operation of public agencies before the actions were commenced, any right of the parties to disturb them in their possession of the property was thereby lost, and only an action to recover compensation for the land taken could be available. (*Gurnsey* v. *Northern Cal. Power Co.*, 160 Cal. 699 ·[117 Pac. 906, 36 L. R. A. (N. S.) 185] ; *Miller & Lux* v. *Enterprise C. & L. Co.*, 169 Cal. 415 [147 Pac. 567] ; *Newport* v. *Temescal Water Co.*, 149 Cal. 531 [87 Pac. 372, 6 L. R. A. (N. S.) 1098].)

There is much argument and citation of authority on both sides as to the foundation for the doctrine that intervention of public use will foreclose the right to an injunction, the plaintiffs insisting that it rests solely in waiver and estoppel which must be pleaded and proved in the trial court, and the defendant contending that it is grounded in public policy of which the court even on appeal may take cognizance when the fact appears. This court has referred to both as a foundation for the doctrine. It has noted the claim or applied the theory of waiver and estoppel in *Barton* v. *Riverside Water Co.*, 155 Cal. 515 [101 Pac. 790,

23 L. R. A. (N. S.) 331] ; *City of San Bernardino* v. *Riverside,* 186 Cal. 7 [198 Pac. 784] ; *Northern California Power Co.* v. *Flood,* 186 Cal. 301 [199 Pac. 315] ; *San Joaquin etc. Canal & Irrigation Co.* v. *Worswick,* 187 Cal. 674 [203 Pac. 999] ; *Conaway* v. *Yolo Water & Power Co.,* 204 Cal. 125 [266 Pac. 944, 58 A. L. R. 674] ; *Collier* v. *Merced Irr. Dist.,* 213 Cal. 554 [2 Pac. (2d) 790; and other cases. In *Gurnsey* v. *Northern Cal. Power Co.,* 160 Cal. 699 [117 Pac. 906, 36 L. R. A. (N. S.) 185], quoted with approval in *Miller & Lux* v. *Enterprise Canal etc. Co.,* 169 Cal. 425 [147 Pac. 567], the court took the position that "this rule is not based so much upon the application of the doctrine of estoppel. . . . It is based mainly on the great principle of public policy under which the rights of the citizen are sometimes abridged in the interests of public welfare". There is little doubt that the application of the doctrine may be invoked on either ground when public use has attached prior to the commencement of the action and depending on the circumstances of the case. It is unnecessary to recount further the history of litigation with reference to the water rights here involved or the facts on which the plaintiffs claim that they should not be foreclosed from resisting the application of the rule of intervention of public use. Under the circumstances here appearing it is improbable that this litigation would, and it is highly desirable that it should not, result in an injunction without conditions prohibiting the defendant from diverting and impounding the waters of Gordon Valley Creek for its municipal uses, and that the only proper procedure should be a remanding of the cause for the ascertainment of damages, if any, and for other appropriate relief.

The plaintiffs insist that if this course be pursued the reversal of the judgment should be on condition that the defendant be compelled to pay all expenses to date of the plaintiffs and other land owners in Suisun Valley for engineer's expenses and fees, court costs, briefs, witness fees and costs, as may be determined by the trial court; that when the amount of damages has been ascertained, the defendant be enjoined from impounding or diverting water until the damages be paid; that if the trial court can find a physical solution which will minimize or eliminate damages to land owners in Suisun Valley by reason of the de-

fendant's project, then, in lieu of damages, it shall prescribe such solution and direct the city to provide and maintain it permanently at its own expense and enforce such requirements by prohibitory or mandatory injunction; that if such solution does not entirely provide against damages, then damages to be awarded to the ascertained extent; that the defendant be compelled to pay all costs and expenses on the new proceeding both in and out of court, including engineer's and attorney's expenses and fees as may be determined by the trial court, and that the defendant be compelled to waive the statute of limitations as to any claims for damages which the land owners may assert by reason of the defendant's project.

The suggestion of the plaintiffs that in the event the trial court should find a physical solution which would minimize or eliminate any damages otherwise recoverable, it should do so by appropriate order, is helpful. It is also apparent that if the court find such a physical solution appropriate it should by its judgment preserve its continuing jurisdiction to change or modify its orders and decree as occasion may require. Therein may lie a solution of many of the difficulties and uncertainties in safeguarding the rights of the parties. As to the question of costs, other than costs on this appeal, the Collier case affords the answer to the extent here justified. It was there held that the cause having been converted practically into a condemnation proceeding, the law seems to be sufficient to vouchsafe the award to the plaintiffs free from costs of the defendant and with the plaintiffs' costs as well. (*Collier* v. *Merced Irr. Dist.*, 213 Cal. 554, 572 [2 Pac. (2d) 790].) Under this ruling the plaintiffs herein would be entitled to their costs taxed by the trial court the same as in an ordinary action in condemnation and from the inception of the present action. As to other conditions sought to be imposed, there can be no question of the power of the trial court to insure by injunctive order the payment of any damages to which the plaintiffs or any of them may be entitled, and it is obvious that the defendant under the facts is in no position to urge the statute of limitations as a bar to the recovery of such damages. The Collier case also answers certain objections raised by the plaintiffs as to

the operation, under the facts here presented, of section 14 of article I of the Constitution.

On the question of the burden of proof the defendant relies on the rule stated in *Brown* v. *Chase*, 125 Wash. 542 [217 Pac. 23, 27], where it is stated: "That where the supply of water in the stream is more than ample for all possible riparian uses, the presumption is that the diversion by a nonriparian user will not injure any riparian right, and the burden is upon the riparian owner who claims that his riparian rights are being injured by the diversion of such water to prove substantial injury.".

The plaintiffs contend for the rule stated in *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256, 272 [107 Pac. 115, 27 L. R. A. (N. S.) 772], as follows: "If the accustomed flow is more than necessary to supply the underground stratum, the burden of proof is upon the appropriator seeking to appropriate the surplus to show that there is a surplus. In the case at bar the burden of proof was upon the defendants setting up a claim to an alleged portion or surplus of flood waters upon the ground that such waters were waste or lost waters to prove the fact."

The general rule in this state as to the burden of proof is laid down in section 1981 of the Code of Civil Procedure as follows: "The party holding the affirmative of the issue must produce the evidence to prove it; therefore, the burden of proof lies on the party who would be defeated if no evidence was given on either side." However, when one enters a field of water supply and seeks by appropriation to take water from such supply on the claim that there is more than sufficient for all reasonable beneficial uses by those who have the prior and preferential right, it would seem to comport with the principles of fairness and justice that the appropriator, in whatever way the issue may arise, should have the burden of proving that such excess exists. We therefore reaffirm the rule to that effect in the Miller case.

The town of Suisun is a plaintiff in this action. This plaintiff is the owner of one acre of land in Suisun Valley not riparian to Suisun, Gordon Valley or Wooden Valley Creeks. Its asserted rights are based on its ownership of the land overlying the underground water supply in the Suisun Valley and an appropriation by use prior to that of the defendant and the construction of wells and

pumping plants on the land. The town of Suisun obtains its main water supply from the Twin Sisters reservoir located at what is called the west end of the valley. This supply is in nowise disturbed by the defendant's project. The wells on said acre of land are maintained as a means of a standby or emergency supply. The only pumping therefrom in any quantity was in the excessively dry season of 1923–24. None of these wells was active at the time of the trial. One had been equipped and tested in 1926 but had not been operated. The court decreed that the defendant, as against the town of Suisun, "is not entitled to impound or divert. . . . and is hereby permanently enjoined and restrained from both impounding and diverting any of the waters of Gordon Valley watershed or Gordon Valley Creek." This injunction was undoubtedly granted on the theory of *Miller* v. *Bay Cities Water Co.*, which accorded to an overlying land owner the right analogous to the riparian right, but which, as has been seen, is subject to the limitation that the exercise of the right must be reasonable under all of the circumstances. The defendant's rights against the town of Suisun differ materially from its rights against private land owners. It is persuasively argued that the defendant has not the power of eminent domain as against the town of Suisun, because of the latter's municipal status. (Secs. 1240, 1241, Code Civ. Proc.) Without the existence of the defendant's project and with the entire stream flow to feed the underground supply, the benefit accruing to the one acre of land would be almost negligible, estimated in a dry year as little as thirty-seven hundredths of an inch. No attempt appears to have been made to show any interference with these wells by the storage by the defendant. Can the town of Suisun, because of its municipal status, compel the use of the entire stream flow to feed such a percolating right, the enjoyment of which is limited to the operation of a well or wells usually inactive and necessary only in years of great shortage? The answer must be in the negative. Any interference by the defendant's storage with the underground supply on this acre of land is technical and unsubstantial. ▉ Conceding, however, that this town's right should be protected by the decree, the prior right could be declared and, if necessary, the duty imposed on the defendant to make up the loss, if any, in kind, thus

supplementing the town's supply to the extent of the loss by means other than by the percolating water process. We find no justification in law or the evidence for this absolute injunction in favor of the town of Suisun where it appears that in any event other forms of relief are available and would be adequate.

We therefore conclude: 1. That the rule of reasonable use as enjoined by section 3 of article XIV of the Constitution applies to all water rights enjoyed or asserted in this state, whether the same be grounded on the riparian right or the right, analogous to the riparian right, of the overlying land owner, or the percolating water right, or the appropriative right.

2. That the test of reasonable use as so enjoined was not applied to the facts in the present action and the judgment should be reversed, and the cause remanded for trial as a condemnation action.

3. That upon a retrial the rights of the parties should be determined in harmony with the new constitutional policy of conservation of waters and in accordance with the views expressed in this opinion.

4. That if, as to any plaintiff, no substantial damages be proved, but a paramount or preferential right be shown, he is entitled to a judgment declaring such right and an injunction against the assertion of an adverse right based on user or lapse of time, or to compensation for the extinguishment of the paramount right, if such course be preferred; that if substantial damages result to the plaintiffs or any of them by reason of the continuance of the defendant's enterprise, taking into consideration the tests to be applied in the conservation and reasonable use of water now required by the law, such plaintiffs are entitled to the ascertainment of such damages and to an injunction in aid of securing timely payment thereof.

5. That if a physical solution be ascertainable, the court has the power to make and should make reasonable regulations for the use of the water by the respective parties, provided they be adequate to protect the one having the paramount right in the substantial enjoyment thereof and to prevent its ultimate destruction, and in this connection the court has the power to and should reserve unto itself the right to change and modify its orders and decree as occasion

may demand, either on its own motion or on motion of any party. (See *City of San Bernardino* v. *Riverside, supra,* and other cases cited to like effect.)

6. That under the circumstances appearing in this case the plaintiffs should recover their costs in the trial court and on appeal.

The judgment is reversed.

Waste, C. J., Thompson, J., Seawell, J., Curtis, J., Langdon, J., and Plummer, J., *pro tem.,* concurred.

Preston, J., was disqualified by reason of having been one of the counsel in the case prior to his election to the Supreme Court.

Rehearing denied.