[Civ. No. 13978. First Dist., Div. Two. June 29, 1949.]

ROSE MARIE BROWN, as Administratrix, etc., Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

Hildebrand, Bills & McLeod for Appellant.

Arthur B. Dunne, Louis L. Phelps and Dunne & Dunne for Respondent.

GOODELL, J.—This action under the Federal Employers' Liability Act was brought by appellant, the widow of Ray Brown, a brakeman employed by respondent. He was run over and killed by an engine while switching at Pittsburg, California, on November 25, 1944. Nobody saw him fall, jump or step from the rear footboard of the engine tender, on which he had been standing just before the accident. The jury returned a verdict for defendant. A new trial was denied, and this appeal from the judgment was taken.

Decedent's train, consisting of the locomotive, three freight cars and a caboose, reached Pittsburg from Tracy between 8 and 8:30 a. m., headed west. The three freight cars were to be transferred to the Santa Fe, and to do this the engine had to get on the other end, eastward of the cars, so as to shove them into place on the transfer track. This could be done only by "dropping" them, which was accomplished by the following operation. A sidetrack immediately north of the main line and parallel to it, was connected with the main line (on which the engine and cars stood) by a crossover. The cars were "bled," i. e., the air was released which freed them from air-brake control from the engine. The train was then started westerly. After a good start the speed was re-

duced which caused a slack between engine and cars and while this slack was on, and while in motion, a pin was pulled which uncoupled the engine from the string of cars. The engine, thus cut off, was then speeded up, across the switch point, and after clearing it the switch was thrown and the cars, coasting on the momentum which the engine had given while pulling them, crossed over onto the sidetrack, where they were brought to a stop by hand-braking. The engine stopped on the main line about 180 feet west of where the cars had been switched. All this time decedent was standing on the rear footboard of the engine tender, and it was he who pulled the pin which cut the engine loose while in motion, after which he gave the engineer an arm signal that this had been done so the engine could speed up and get clear of the cars as they rolled onto the other track. The "drop" was smoothly and successfully completed and it is conceded that it had nothing to do with this accident.

The next move was for the engine to run back, easterly, to just beyond the switch, then reverse and run forward and over the crossover, onto the sidetrack, so as to shove the cars into their places on the transfer track.

Brakeman Peters was handling the cars and saw nothing of the accident; the conductor was in the depot and saw nothing of it. Brakeman Varner was on the ground and while the engine was at a standstill after the "drop" he saw decedent standing on the rear footboard of the tender. Varner went to throw the switch so the main track would be relined for the passage of the engine over it.

Decedent, according to the engineer's testimony, leaned out on the engineer's side of the rear footboard and gave the arm signal to back up. The engineer responded by starting the engine easterly toward the switch. After giving the back up signal decedent gradually disappeared from the engineer's vision.

As Varner straightened up from relining the switch he saw decedent lying across the north rail, on his right side, facing the rear of the engine, with the footboard against him. Varner stepped to the north so the engineer would see him and with both arms gave him a violent stop signal and pointed to the rail. The engineer threw on the emergency brake but the decedent was run over and killed by the rear wheels of the tender.

The footboard was characterized by appellant's witness

Frost as standard, and he described it thus: "They are divided. Placed from the drawbar to the outside edge of the tender, on each side. The footboard is about 8 or 10 inches wide, made of 2-inch material, sufficient to support a man on them." This witness visited the scene that morning and there is nothing in his testimony to indicate anything unusual about the footboard. The fireman testified that there was no oil on it; "everything was perfect"; it was perfectly flat; it was not loose; "everything was mechanically O. K." Another witness testified there was no sand or gravel on the footboard. The engineer immediately made a complete inspection of his engine and found nothing unusual. He also examined the rails and ties and found no evidence of dragging. The day was dry.

The engineer and fireman testified that the bell was rung before the engine started up; that its start was gradual, without any jerk or anything unusual; that on Varner's emergency stop signal it came to an immediate stop. Varner himself said it made a good stop. A Pittsburg traffic officer testified that decedent's body was 19½ feet under the tender. All the testimony shows that the engine from start to stop traveled about 45 feet, which means that it went but 26 feet before running over decedent and about 19 afterward. The engineer testified that when he received the emergency stop signal he was going from 3½ to 4½ miles per hour; the fireman put it at 2 or 3, and Varner at 5 or 6. Varner testified that he did not hear the bell when the engine started.

The original complaint was drawn on the theory that the engine had been "suddenly, violently and unusually jerked" whereby decedent was thrown from the footboard and run over. A second count repeated these allegations and added that the trainmen (other than decedent) "failed and neglected to keep a proper lookout for signals and . . . to stop said engine in time" to prevent decedent being run over after being thrown to the track. At the conclusion of plaintiff's case she moved to amend the complaint to conform to the proof and was permitted to do so. The amendment replaced the second count and alleged that decedent had stepped from the footboard and had been run over through the negligence of the other employees of respondent.

In discussing the amendment with the court appellant's counsel said: "Well . . . there are certain cases where you just don't know, as we don't know in this case. Nobody knows how he got on the ground."

The case was tried on the theory that a sudden jerk of the engine had thrown decedent off. There was no evidence that he stepped off.

Appellant attempted to establish that it is the duty of an engineer, as soon as the head-end brakeman in an ordinary switching operation—riding on the footboard of his engine— disappears from his vision, to immediately stop his engine.

Appellant's only contentions on appeal are that the court committed prejudicial error in rejecting certain evidence offered by appellant and in admitting certain evidence offered by respondent. The first point is that appellant's witness Frost should have been permitted to answer a question touching custom and practice.

Frost was a conductor employed by respondent and had been steadily with that railroad either as conductor or brakeman for 22 years. He went to the scene of the accident that morning and had seen the engine there. He had worked with that engine and with others of the same class. He described the footboard. He gave as his opinion that a light engine (meaning one not coupled to cars) going approximately 5 miles an hour on dry, level track, could make an emergency stop within 5 or 6 feet. He was then asked "Now, then, in regular custom and practice, when a brakeman or a switchman is working on a footboard of a light engine, that is, with no cars attached to it, and assuming that that brakeman or switchman is directing the movement of the engine, and that he suddenly disappears from view, from the view of the engineer, what, in regular custom and practice, does the engineer do, if anything?" An objection that it called for the opinion and conclusion of the witness was sustained. Appellant's counsel then said, "All right. I believe that is all. You may cross-examine." Thus "the subject was immediately dropped upon the sustaining of the objection." (See *Shasta Lumber Co.* v. *McCoy*, 85 Cal.App. 468, 474 [259 P. 965].)

We are satisfied that the ruling, if error, was not prejudicial. Three witnesses had preceded Frost. Brakeman Varner had given a comprehensive description of everything up to and including decedent's death. Officer Wildes, the Pittsburg traffic officer, had testified to the position of decedent's body under the tender. Mrs. Brown had testified to her marriage to decedent, as to his age, and other matters unrelated to the physical facts. The engineer had not yet testified as to decedent disappearing from his view.

The rule where the question is not followed up with an offer of proof or any indication what the answer if given would show, is found at 2 California Jurisprudence, page 275, where some of the early cases are cited.

Among the later cases is that of *Grandy* v. *Southern Pacific Co.*, 9 Cal.App.2d 441, 442, 444 [49 P.2d 1127], which was an action by a pedestrian for injuries sustained when struck by a freight car. The opinion shows that "There was no watchman or flagman at the crossing, although it was a rule and custom of the company to have a flagman on duty when the crossing was being used by trains. No warning signal of any sort was given by the train crew." The trial court directed a verdict for the defendant. It was contended on appeal that the court committed prejudicial error in sustaining an objection to a question. The court said: "Plaintiff . . . testified that during a period of five years he had on probably ten occasions seen cars and switch engines backing over the drive-way-sidewalk crossing, where the accident occurred. He was then asked: 'Now at those times, would there or would there not be any person down there at the crossing?' Objection being interposed to the question, it was sustained. This ruling plaintiff asserts was prejudicial error. Prejudicial error will not be presumed in a ruling of the trial court sustaining an objection to the introduction of evidence. If error is alleged to exist, it must be made to appear affirmatively in the record. (*Snowball* v. *Snowball*, 164 Cal. 476, 480 [129 P. 784] ; *County of Sonoma* v. *Hall*, 129 Cal. 659, 662 [62 P. 213] ; *Marshall* v. *Hancock*, 80 Cal. 82, 83 [22 P. 61].) Where a question to which an objection is sustained does not itself indicate that the answer to it will be favorable to the party seeking to introduce the testimony, before the ruling will be reviewed on appeal by this court, an offer of what is proposed to be proven must first be made to the trial court, so that this court can determine whether the proposed evidence would have been *material* and *beneficial* to the party offering the evidence. [citations]. There was nothing in the question asked to indicate the answer nor was any offer of proof made which even indicated that counsel expected an affirmative answer to the question. [citations]. Therefore the record fails to show any error in this ruling." A hearing by the Supreme Court was denied, and several years later that court cited the Grandy case approvingly in *MacDonnell* v. *California Lands Inc.*, 15 Cal.2d 344, 348, 349 [101 P.2d 479], saying that the rule "has been invariably followed by the appellate courts of this state."

The interrogation now under discussion dealt with "regular custom and practice." For that reason the case of *Travelers Fire Ins. Co.* v. *Brock & Co.*, 30 Cal.App.2d 115, 117 [85 P.2d 904], is in point. There it was claimed that the court had committed prejudicial error in sustaining an objection to questions relative to an alleged custom in the jewelry trade with reference to the liability assumed by one jeweler who accepts merchandise for repair from another jeweler. The court, in applying the rule, said: ". . . nor was any offer of proof made as to what the custom was that appellant was endeavoring to prove. So far as is disclosed by the record here, the custom referred to by plaintiff's witnesses might have placed the entire responsibility for the loss of the brooch upon appellant, and in the absence of a showing to the contrary we must assume in support of the judgment that such was the fact."

There are numerous cases holding the same way, both before and after the Grandy and Brock cases, many of which are cited by respondent, but appellant has made no attempt to explain or distinguish them. We cannot hold the ruling to be prejudicial error without running counter to this rule, which has been settled law ever since *Marshall* v. *Hancock,* 80 Cal. 82 [22 P. 61], and perhaps earlier.

■ Respondent's rule 7-B reads in part as follows: "In backing a train or cars or shoving cars ahead of the engine, the disappearance from view of trainmen or lights by which signals are given will be construed as a stop signal."

Appellant offered this in evidence and it was admitted over respondent's objection that it had "no application or bearing upon the facts of this accident." The objection should have been sustained on the ground stated. At the time of the accident the engine was not backing a train, or a train of cars, or backing cars, or shoving cars ahead. It was a "light engine" coupled to no car or cars, ahead or behind, backing up by itself. These facts make it clear that rule 7-B had no application, its very language showing that it covers only an operation where cars are involved, and then only while being backed or shoved.

However, the rule was admitted in evidence and respondent called two witnesses for the purpose of showing its non-applicability. The answers which these witnesses gave are now claimed to run counter to *Richman* v. *San Francisco, etc. Railway,* 180 Cal. 454 [181 P. 769].

The witness V. E. Anderson, assistant superintendent of respondent's Salt Lake Division, was its assistant trainmaster

and stationed at Pittsburg, California, on November 25, 1944. He had been a switchman, train man, yard master, assistant trainmaster, trainmaster, terminal superintendent and assistant superintendent. He was familiar with the company's operating rules; had occasion to enforce them every day, and had given examinations on them.

The rule was read to him by respondent and he was asked to tell its purpose. Appellant's objection "on the ground the rule is the best evidence and speaks for itself" was overruled. The answer was entirely harmless. It was: "That rule, its proper interpretation would be if [we emphasize the 'if'] an engine is shoving cars, or a car, and curvature of the track would take the man that is riding the leading point out of sight of the engineer, and the engineer would not know where he is shoving, he shall stop until some member of the crew will place himself in a conspicuous position to pass signs to the engineer." The answer was predicated entirely on the condition *"if an engine is shoving cars, or a car,"* which was nothing but a paraphrase of the rule. Having been so predicated on an assumed fact wholly foreign to the case, the answer was purely abstract, academic and hypothetical. Prejudicial error cannot be based on such a situation, regardless of what the Richman case holds.

After the answer the record shows: "Q. And did that rule apply to this situation that we have been discussing? A. No, sir, it did not. Q. And that is the way it is so interpreted by the company? A. The engineer could see where he was going." The conclusion that it did not apply simply told the jury what they already knew from the plain language of the rule itself.

The same question was put to the witness Ryan, who gave substantially the same answer, and what has been said applied to his testimony as well.

This brings us to another part of the book of rules. On the cross-examination of the engineer counsel for appellant read into the record the following from page 7 of the rules: "Note. Where in these rules, special instructions in the time table, or in a time table bulletin or train order, the following terms appear, they will apply as follows: 'Engine', to either engines or motors, train or trains, in connection with speed restrictions or the observance of signals, except train order signals. Also applies to engines." Respondent objected on the grounds that "it has no application at all. It refers to his speed restriction and observance of automatic signals . . . it is without founda-

tion, and there is no showing it has any connection with this case. There is no evidence that it was violated. It refers to speed restrictions, which are not in point, and observance of automatic block signals, which are not in point here . . . And there is no evidence of a time table, a time table bulletin or train order . . . it is completely without foundation." The objection was overruled.

The first question which respondent asked Anderson respecting the "note" or definition of terms was not objected to. It asked him to "tell us first what are train order signals," and he answered: "A train order signal is a semaphore type signal, consisting of a signal mast, which is like a kind of. a telephone pole, with a blade, which is the semaphore blade. And when a train is approaching it, if they have train orders under, it will be in a horizontal position, and if they do not have train orders for that train, it drops down into what we refer to as a clear position. That is why, in the note on page 7 that signal is exempt." The witness was then asked "What is . . . the original intention and purpose of that note exception on page 7?" to which appellant objected "on the ground already stated" ["that note and that rule are perfectly plain and speak for themselves"]. When the objection was overruled the witness answered: "That is to call attention that that rule should be observed so far as fixed signals, whistle boards, speed boards, any signal that is generally considered as fixed in its position and not moved from place to place."

At least one part of the "note" is clear, i. e., that the term "engines" includes motors, but that is not involved herein. What is meant by "train or trains" in the grammatical setting in which those words are found is not at all clear, but engine 2301 was not a "train" at the time of the accident since the evidence shows without conflict that it was merely a "light engine" engaged in switching and had no "markers" on. "Also applies to engines" would seem fairly to mean that any "speed restrictions or the observance of signals" which trains were bound to obey, light engines were likewise bound to obey.

In attempting to construe this rather obscure "note" (which, if it "speaks for itself" does not do so very audibly or clearly) we are in no way helped by counsel for appellant, for they nowhere, either in the record or the briefs, attempt to tell us what it was supposed to prove or how it was supposed to relate to the instant facts. If appellant's purpose was to have it read in combination or connection with rule

7-B, that would not help, for 7-B is circumscribed and limited by its own ''backing'' and ''shoving'' provisions, and those provisions would likewise circumscribe and restrict anything read in connection with it. It could not enlarge or broaden the scope of rule 7-B or draw 7-B's provisions any nearer to this case.

Appellant, whose burden it is to establish prejudicial error, should show how Anderson's or Ryan's answers to the questions on the ''note'' were harmful. That has not been done. Appellant has not even shown how the ''note'' touches the case at all. It seems to us as remote as rule 7-B, and that Anderson's and Ryan's answers respecting it were just as harmless as the answers they gave respecting 7-B. If these two witnesses had been questioned respecting a rule covering the switching operation at the time of the accident, a problem similar to that in the Richman case might have been presented. There is no such problem, hence no need to discuss the Richman case at all.

We find no prejudicial error in the record.

The judgment is affirmed.

Dooling, J., concurred.