[No. B001908. Second Dist., Div. Six. Nov. 7, 1985.]

MARTHA H. WRIGHT et al.,
Plaintiffs, Cross-defendants and Appellants, v.
GOLETA WATER DISTRICT,
Defendant, Cross-complainant and Appellant;
COUNTY OF SANTA BARBARA et al.,
Cross-defendants and Appellants.

**COUNSEL**

Hatch & Parent, Stanley C. Hatch, Stanley M. Roden, Thomas D. Wise and Scott S. Slater for Plaintiffs, Cross-defendants and Appellants.

Robert E. Goodwin for Defendant, Cross-complainant and Appellant.

Kenneth L. Nelson, County Counsel, Enrique R. Sanchez, Deputy County Counsel, Steven A. Amerikaner, City Attorney, Leslie E. Lobaugh,

Woodrow D. Smith, Griffith & Thornburgh and L. Donald Boden for Cross-defendants and Appellants.

## Opinion

**STONE, P. J.**—Here, we are asked to decide whether a trial court, in a judicial determination of a ground water dispute among private parties and public entities, may define or otherwise limit future ground water rights of an overlying owner who has not yet exercised those rights. We hold that it may not and reverse the judgment.

### Facts

*The Scenario*

The instant case flows from an action for declaratory and injunctive relief filed in November 1973, by certain overlying landowners (Landowners) against the Goleta Water District (District) to determine relative rights to ground water use in the North and Central sub-basins (Central basin) of Santa Barbara County. District answered and filed a cross-complaint against over 220 other overlying owners and appropriators to enjoin overdrafting the Central basin.

*The Cast*

Landowners, holders of some legal or equitable interest in real property overlying the Central basin, claim prior, correlative rights to use of ground water.

District is a county water district organized in 1944 pursuant to California Water Code section 30000 et seq., which sells and distributes water to the general public throughout the district for domestic, commercial, industrial, agricultural, recreational, governmental and other beneficial purposes. It serves approximately 13,000 customer accounts. The total number of persons inhabiting the District is approximately 75,000, of which 3,000 reside within La Cumbre Mutual Water Company service boundaries. District's primary source of water is Lake Cachuma, a federal Bureau of Reclamation project situated in Santa Barbara County.

La Cumbre Mutual Water Company (La Cumbre), cross-defendant and cross-appellant, is a mutual water company organized in 1928. It serves water primarily to residential customers within an area not directly served

by District. District, cross-complainant and cross-appellant, sells substantial amounts of water each year to La Cumbre under a long-term contract entered into many years prior to filing of this action. La Cumbre obtains the balance of its water from wells, some of which are located in the Central basin.

Cross-defendants and appellants County of Santa Barbara (County), Santa Barbara and Goleta Union High School Districts (School Districts) and cross-defendant and appellant City of Santa Barbara (City) are public entities which own land overlying the Central basin.

Cross-defendant and appellant Pacific Lighting Service Company (Pacific)—a public utility corporation—has owned five parcels of property overlying the Central basin since 1945. It has a water well on one of those parcels which it has utilized on a continuing basis since 1945, including the years 1973 through 1978, to produce water for use in construction and maintenance of gas storage wells on said overlying properties.

One hundred thirty-one cross-defendants appeared in these actions and ninety-five parties had defaults entered against them. Some of the cross-defendants' properties presently receive no water service; others' properties obtain water from private wells, or water from District by means of a regular water connection, or both.

*The Plot*

The Goleta Groundwater Basin is an area of land within the boundaries of District consisting of geological features which allow large quantities of rainfall and stream flows to percolate into and be stored underground, suitable for extraction and use by water wells. The basin consists of four subbasins, known as the Central, North, East and West sub-basins, of which Central and North sub-basins are hydrologically interconnected. The East sub-basin is hydrologically separate and independent of Central and North sub-basins. The West sub-basin is considered hydrologically separate and independent of the Central and North sub-basins.[1]

Since water years May 15, 1972—May 14, 1973, the total average annual volume of water supplied by District to its customers has been approximately 15,000 acre feet. Under terms of its contract with the Bureau of Reclamation and Santa Barbara County Water Agency, District has the right

---

[1] District moved, posttrial, to reopen to introduce a hydrologist's report that the West basin is interconnected with the Central basin. The amount of additional water available from it was small and of poor quality. The court denied the motion.

to purchase approximately 10,000 acre feet of water per water year from Lake Cachuma. From time to time, depending upon availability, District may purchase excess water from the Bureau of Reclamation and other water-serving districts and municipalities in the Santa Barbara area.

District may also purchase "spillwater," if available, in amounts determined by the bureau. A waste reclamation project is being developed by District, subject to availability of state and federal funding sources, which has potential for providing 900 acre feet of water annually for irrigation.

District currently operates a reverse osmosis treatment system demonstration project with potential for developing increased waste water reclamation. County and Goleta Union School District have granted District long-term licenses over their properties for construction and use of District's wells. Historically, private agricultural pumpage of water wells increased substantially from the mid-1930's until 1955. The Cachuma Project was subsequently completed, and thereafter agricultural pumping rapidly declined as agricultural lands were developed commercially and residentially and were served with water by new connections from District. Between 1960 and 1970, the population of Goleta Valley tripled, rising from approximately 19,000 to approximately 60,000. District has, since 1963, made continuous use of water contained in the Central basin. Water has been drawn from wells on real property overlying the basin, rights to which were owned by District in fee or by license. All water extracted by District from the basin is used by customers of District residing in the District.

In December 1972, pursuant to applicable provisions of the California Water Code, District adopted resolution 714, declaring a water emergency condition within the District, and adopted its ordinance 72-2, substantially restricting new water service connections to District's water distribution system for the duration of the water shortage. In May of 1973, voters of the District adopted an initiative measure, which also imposed a moratorium on new water connections. This moratorium does not apply to La Cumbre's sales to its customers, and La Cumbre allows new water service connections and development of property within its service area, known as "Hope Ranch."

In 1975, voters of District rejected a proposal for development of the El Capitan-Ellwood ground water basin as an additional source of water for the District.

In March 1979, voters of Santa Barbara County rejected a proposal for importation of water to the county from the state water project.

Prior to commencement of this action, District was using and had publicly announced for planning purposes 5,800 acre feet as the safe yield of the entire Goleta Groundwater Basin, without allocation of portions thereof to various sub-basins. ▮ ▮▮▮ District first began using the figure of 3,410 acre feet as the safe yield of the Central sub-basin in March 1976, when it received a report of its consulting hydrologist concerning results of his study started January 1973.[2] Before this action was filed, pumping by District and cross-defendants did not exceed 3,410 acre feet. The parties first fully extracted that figure near the beginning of March 1974.

During the water year, 1973-1974, District had extracted 939 acre feet as of date landowners filed their complaint, but increased it to 2,213 by March 1974, the date safe yield was first exceeded. La Cumbre had extracted 717 acre feet by the beginning of November 1973, and increased its total to 871 acre feet by February and to 943 acre feet by May 14, 1974. Landowners drew a total of 318 acre feet for the entire water year of 1973-1974.

*The Staging*

The superior court divided the trial into three parts. The first phase, beginning October 30, 1978, was limited to determination of each party's status and statement of claims, and date such status or interest was established. The second phase commenced May 21, 1979, and involved a declaration of rights, whether any party was entitled to injunctive relief, and also dealt with determination of safe yield in the Central basins. The third phase concerned damages and was to be held only after the court's determination of issues decided in the second phase. As the court decided no party was entitled to damages, this phase never surfaced.

*The Denouement*

After hearing conflicting expert testimony on safe yield, the court found the safe yield of the Central basins to be 3,410 acre feet. In its preliminary ruling on water rights, the court found that District and La Cumbre occupied the legal status of appropriators of water from the Central basin and that La

---

[2]*Definitions:* "Safe yield" is defined as "the maximum quantity of water which can be withdrawn annually from a ground water supply under a given set of conditions without causing an undesirable result." (*City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 278 [123 Cal.Rptr. 1, 537 P.2d 1250].) "Undesirable result" is a gradual lowering of the ground water levels leading eventually to depletion of the supply. (*Ibid.*) "A ground water basin is in a state of surplus when the amount of water being extracted from is less than the maximum that could be withdrawn without adverse effects on the basins' long term supply. . . . Overdraft commences whenever extractions increase, or the withdrawable maximum decreases, or both, to the point where the surplus ends." (*Id.*, at pp. 277-278.)

Cumbre was the prior appropriator. It further found that District had established a dedication for public use not precluded by Civil Code section 1007 as against the public agencies, County, City, School Districts and Pacific, and, as of November 1973, District had the right to appropriate an annual quota of 1,103 acre feet.

In its memorandum of intended decision, statement of decision and judgment, the court switched horses in midstream and based its decision on the California Supreme Court case of *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339 [158 Cal.Rptr. 350, 599 P.2d 656] (Long Valley). It ruled, in pertinent part: "1. Those rights to the extent exercised by parties hereto as of the date of filing of this litigation, are hereby confirmed as having a higher priority than any unexercised rights of the other parties hereto as of that time. 2. Said unexercised rights of the parties are not extinguished herein, but are hereby determined to have lower priority than the rights actually exercised by the other parties as of said date. 3. Of the 3,410 acre feet of water comprising the safe annual yield of the central and north sub-basins [Central basin] . . . the District shall be entitled to extract an average of 1,103 acre feet of water—including return flow water—per year. District shall be entitled to extract additional amounts of water on the average up to the remaining balance of the safe yield (not presently being extracted by the other parties), provided that as said other parties increase or commence new extractions, District shall make commensurate reductions in its extractions to the ultimate lower level of 1,103 acre feet. La Cumbre shall not be entitled to increase its present average extractions, nor shall it be required to reduce its extractions unless and until further order of the Court. 4. Of the 3,410 acre feet of water comprising the safe annual yield of the [Central basin] of the Goleta Water District, the parties other than the District shall be entitled to extract collectively only the balance of the safe yield annually. 5. Since the unexercised rights of the parties have not been extinguished, such parties are not entitled to an award of compensation herein, nor to attorneys fees. 6. The Court reserves continuing jurisdiction over the parties hereto with respect to the issues determined herein. . . ."

Appeals therefrom by Landowners, City, County, School Districts, La Cumbre and Pacific and District's cross-appeal flowed more vigorously than the percolating waters in the Central basin.

## ISSUES

Among the turbulent cascade of issues, only certain tributaries central to the stream merit discussion; others are necessarily resolved by our determination of these issues: (1) Are the principles of *Long Valley* applicable

to private ground water disputes? (2) Is the trial court's selection of safe yield erroneous? (3) Is there a factual basis for applying dedication to public use or intervening public necessity? (4) Do Civil Code section 1007, and Water Code sections 106.5 and 1203, preclude priority over public entities? (5) Is La Cumbre's right to extract water superior to District's? and (6) Did the trial court correctly quantify District's water rights?

Discussion

1. *Application of Long Valley to Ground Water Adjudication*

█ In *Long Valley,* the California Supreme Court deliberated the State Water Resources Control Board's (Board) power to define and otherwise limit prospective riparian rights in determining all claimed rights to the use of water in a stream system, pursuant to the statutory adjudication procedure set forth in Water Code section 2500 et seq. It concluded that the Board has broad authority to define and otherwise limit future riparian rights but that the Legislature, through the Water Code, did not authorize the Board to extinguish altogether future riparian rights. In pertinent part, the Supreme Court held that ". . . the Board is authorized to decide that an unexercised riparian claim loses its priority with respect to all rights currently being exercised. Moreover, to the extent that an unexercised riparian right may also create uncertainty with respect to permits of appropriation that the Board may grant after the statutory adjudication procedure is final, and may thereby continue to conflict with the public interest in reasonable and beneficial use of state waters, the Board may also determine that the future riparian right shall have a lower priority than any uses of water it authorizes before the riparian in fact attempts to exercise his right." (25 Cal.3d at pp. 358-359.)

Since an overlying right to ground water is analogous to that of a riparian owner's right in a stream (cf. *Tehachapi-Cummings County Water Dist.* v. *Armstrong* (1975) 49 Cal.App.3d 992, 1001 [122 Cal.Rptr. 918]; *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 925 [207 P.2d 17]), the trial court opined that it took no "quantum leap" in reasoning to apply the principles enunciated in *Long Valley* to the instant case. To plumb the depths of this issue, it is helpful to review applicable legal principles prior to *Long Valley.* Under English common law, overlying landowners owned everything that lay directly below the surface of their land. Rules applied to water running in streams were not used in ground water adjudication because of the belief that movement of percolating ground water was unascertainable. (Comment, *Groundwater: A Call for a Comprehensive Management Program* (1983) 14 Pacific L.J. 1279, 1282.) In 1903, the California Supreme Court rejected the common law rule in *Katz* v. *Walkinshaw*

(1903) 141 Cal. 116 [74 P. 766], and recognized that since ground water was a limited resource, the rule of absolute ownership would threaten all water resources of the state. (*Ibid.*) In *Katz,* the Supreme Court established the doctrine of reasonable use which limits rights "to such amount of water as may be necessary for some useful purpose in connection with the land from which it is taken." (141 Cal. at p. 134.) The court enunciated such rights to be usufructuary only, and that overlying landowners have correlative rights in the common supply. Overlying users' rights are paramount to those who appropriate water for use on distant land, but since the landowner's right extends only to the quantity of water that is necessary for use on his land, the appropriator can take the surplus. (*Id.,* at p. 135.) It became settled law that correlative rights of overlying landowners, like riparian rights, did not depend upon use and were not lost by disuse, in absence of prescriptive rights against them. (See *Hudson* v. *Dailey* (1909) 156 Cal. 617, 627-628 [105 P. 748].) Additionally, nonuse of overlying rights has been protected as against appropriative use. (See *Burr* v. *Maclay Rancho Water Co.* (1908) 154 Cal. 428, 436-439 [98 P. 260].)

In 1928, the California Constitution was changed, in a watershed amendment, to provide that state water resources be put to beneficial use, and that waste or unreasonable use be prevented.[3] The Supreme Court explained that "[t]he effect of this amendment has been to modify the long-standing riparian doctrine . . . and to apply, by constitutional mandate the doctrine of reasonable use between riparian owners and appropriators, and between overlying owners and appropriators. . . . The trial court, under the new doctrine, must fix the quantity required by each riparian for his actual reasonable beneficial uses, the same as it would do in the case of an appropriator. The new doctrine not only protects the actual reasonable beneficial

---

[3]Article X, section 2, formerly article XIV, section 3, reads as follows: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent to which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

uses of the riparian but also the prospective reasonable beneficial uses of the riparian. As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such uses arises. Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator. By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription, but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses. The trial court might well, by appropriate provisions in its judgment, retain jurisdiction over the cause, so that when a riparian claims the need for water, the right to which was awarded him under such a declaratory decree, the trial court may determine whether the proposed new use, under all the circumstances, is a reasonable beneficial use and, if so, the quantity required for such use. [¶] It is to be noted that the new doctrine embodied in the constitutional amendment, as interpreted in the Peabody case, [4] not only applies the doctrine of reasonable use as between riparian and appropriator, but also as between an overlying owner and an appropriator. The overlying owner in this state has been held to have analogous rights to those of a riparian. [Citations.] Such overlying owner is now subject to the same restrictions as those applicable to riparian owners." (*Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 524-526 [45 P.2d 972].)

The California Supreme Court reiterated these principles in subsequent cases and elaborated that inquiry into reasonable use "cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance" and that paramount was the ever increasing need for the conservation of water in this state. (*Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140 [60 Cal.Rptr. 377, 429 P.2d 889].) Furthermore, the court stated that there is no legally protectible interest in the *unreasonable* use of water, and the constitutional amendment was adopted for the purpose of redefining water rights rather than merely providing remedies for their invasion. (*Id.,* at p. 144.)

In *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419 [189 Cal.Rptr. 346, 658 P.2d 709], in discussing the state's duty to consider the public trust in planning and allocation of water resources, the Supreme Court stated: "The population and economy of this state depend upon the appropriation of vast quantities of water for uses unrelated to in-stream trust values. California's Constitution . . . its statutes . . . decisions . . . and commentators . . . all emphasize the need to make efficient use of Califor-

[4]*Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486].

nia's limited water resources: all recognize, at least implicitly, that efficient use requires diverting water from in-stream uses. Now that the economy and population centers of this state have developed in reliance upon appropriated water, it would be disingenuous to hold such appropriations are and have always been improper to the extent that they harm public trust uses, and can be justified only upon theories of reliance or estoppel." (33 Cal.3d at p. 446, fn. omitted.)

In *Long Valley,* the Supreme Court held that the Legislature had enacted a *comprehensive administrative scheme* for the final determination of *all* rights in a stream system and had granted the Board the power to define and otherwise limit prospective riparian rights, when pursuant to Water Code section 2500 et seq. it determines all claimed rights to use of water in the stream system. (25 Cal.3d 339, 358-359.) The court supported its conclusion by compelling policy considerations and acknowledgment that uncertainty is one of the major problems in contemporary California water rights law. (P. 355.)

In *People* v. *Shirokow* (1980) 26 Cal.3d 301 [162 Cal.Rptr. 30, 605 P.2d 859], the Supreme Court held that the Water Code's comprehensive statutory scheme for granting appropriative rights by the Board (§ 1200 et seq.) precludes acquisition of prescriptive rights heretofore traditionally available to nonriparian users. The court concluded that a contrary holding would "substantially impair the board's ability to comply with the legislative mandate that appropriations be consistent with the public interest" and that nonsanctioned uses would cause difficulty in determining whether the waters of the state are being put to beneficial use for the greatest public benefit. (26 Cal.3d 301, 309, 310.)

District points out that the same considerations apply equally to ground water law and that, since courts share concurrent jurisdiction with the Board in deciding water cases (see *National Audubon Society* v. *Superior Court, supra,* 33 Cal.3d 419, 448-453), what the Board can determine in riparian rights, the superior court should be able to adjudicate in ground water cases.

*Long Valley,* in a riparian setting, recognized the pernicious effects of uncertainty concerning the rights of water users, including the inhibition it causes on long-range planning and investment for development and use of water, and the fostering of costly and piecemeal litigation. (25 Cal.3d at p. 355.) Those same factors *should* apply with equal vigor to ground water rights since the Legislature "has totally failed to enact a program that would fulfill the state's own policy declarations." (*Groundwater; A Call for a Comprehensive Management Program, op. cit. supra,* 14 Pacific L.J. 1279, 1298.) Like the unexercised riparian right, the unexercised ground water

right of an overlying landowner is unrecorded, of unknown quantity, with little opportunity for control in the public interest, and wasteful to the extent it deters others from using water for fear of its ultimate exercise. (*Long Valley, supra,* 25 Cal.3d at p. 355; cf. Rossmann & Steele, *Forging the New Water Law; Public Regulation of "Proprietary" Groundwater Rights* (1982) 33 Hastings L.J. 903.)

Even though it may appear a logical extension of *Long Valley* to allow a trial court adjudicating competing claims to ground water to subordinate an unexercised right to a present appropriative use, we must hold such extension inappropriate. Philosophically, we agree with District's position but stare decisis and due process considerations, not a concern under the current riparian statutory scheme, compel us to reach the opposite conclusion in this case.

■ We acknowledge that all water use is now governed by article X, section 2 of the California Constitution, and accordingly, all use of water in this state must conform to the standard of reasonable use. "[P]rivate property rights in water fall before decisions made pursuant to the public trust doctrine, the doctrine dictating that water allocation benefit all of the people." (*Santa Clarita Water Co.* v. *Lyons* (1984) 161 Cal.App.3d 450, 462 [207 Cal.Rptr. 698].)

■ Nevertheless, *Long Valley, Shirokow,* and *National Audubon Society* all limit their discussions to *riparian* rights within the statutory scheme of the Water Code. Ground water is exempted from the extensive regulations of surface water. (Wat. Code, § 1200 et seq.) In point, *Long Valley* acknowledged that a substantial body of case law governing a riparian's prospective rights has developed in this state including the Supreme Court's recognition that rights of a riparian owner are not destroyed or impaired by nonuse, that the riparian right exists whether exercised or not, that a dormant riparian right is paramount to active appropriative rights, and that it may be proper for the trial court to retain jurisdiction over the matter so that the riparian's prospective right can be quantified at the time he decides to exercise it. (25 Cal.3d at p. 347.) "Such principles, however, are limited in their application to a context in which water rights are determined through piecemeal adjudication that will settle disputes among only a small number of those persons who claim a right to the use of water in a stream system. The judgment in this type of adjudication necessarily can bind only those who are parties to the litigation; it may subsequently be nullified by the assertion of a legitimate claim by a water user on the stream who was not a party to the suit. The most that a trial court can do in such a case, therefore, is to retain jurisdiction over prospective riparian claims. [¶] This court has never declared that the foregoing approach is to be preferred over

a statutory procedure for the comprehensive determination of *all* rights to the use of water in a stream system; rather, we have recognized that there is a limitation inherent in the ability of private lawsuits to provide clarity, certainty, and security to water rights and water users." (*Ibid.*) Thus, the Legislature could provide for comprehensive *administrative* determinations that may affect the nature of prospective riparian rights, consistent with the promotion of reasonable and beneficial use of state waters. (*Id.*, at p. 358, fn. 14.) These statutory proceedings determine *all* rights, resulting in a final and comprehensive determination and consequently necessarily involve "considerations that transcend those at stake in a private dispute between a limited number of parties." (*Id.*, at p. 360.)

Statutory adjudication of rights in a stream envisions notice to all parties and final adjudication of all claims. The decree is conclusive as to rights of all existent claimants upon the stream system (§ 2773), and any claimant who has failed to appear and submit proof of claim is barred from subsequently asserting any rights upon the stream system embraced in the proceedings. (§ 2774.)

Although it is theoretically possible that judicial determination may provide complete resolution of water rights in an underground basin this action did not purport to do so. District indicates that, "to the best of its knowledge," all overlying owners, governmental entities, appropriators and public utilities with a potential interest in using water from the Central basin were joined herein, and even if a nonjoined landowner, not yet taking water from the basin, were to later come forth, he would have no greater rights than the nonusing landowners actually before the court. District argues further that since the action does not attempt to allocate the landowner's share of the safe yield among themselves, a later suit by a nonjoined landowner would not upset the judgment in any way. This reasoning is not persuasive.

The court's judgment gave District an *absolute* priority for 1,103 acre feet per annum no matter how many persons with proof of an overlying use before District began pumping in 1963 later appeared to present their claim. Other overlying landowners owning these present rights to future use are entitled to notice and an opportunity to resist any interference with them. (*Orange County Water Dist.* v. *City of Colton* (1964) 226 Cal.App.2d 642, 649 [38 Cal.Rptr. 286].) ■ A court has no jurisdiction over an absent party and its judgment cannot bind him. (*Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 368 [140 Cal.Rptr. 744].) This is true even though an adjudication between the parties before the court may on occasion adversely affect the absent person as a practical matter, or leave a party exposed to a later inconsistent recovery by the absent person. (*Id.*, at p. 367.)

Thus, even though article X, section 2 applies to ground water as well as stream water and courts have enjoyed concurrent jurisdiction with the Board to enforce it (cf. *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 199-200 [161 Cal.Rptr. 466, 605 P.2d 1]), absent a statutory scheme for *comprehensive determination* of all ground water rights, the application of *Long Valley* to a private adjudication would allow prospective rights of overlying landowners to be subject to the vagaries of an individual plaintiff's pleading without adequate due process protections.

Therefore, we must reverse the judgment and remand the matter for a redetermination in accord with the principles enunciated in *Tulare Dist.* v. *Lindsay-Strathmore Dist.* which *Long Valley* acknowledged were applicable to private adjudications. For the trial court's guidance, we shall address several remaining issues.

## 2. *Safe Yield*

Several appellants allege there is insubstantial evidence to support the trial court's determination of 3,410 acre feet as the safe yield of Central basin. They contend that the factual basis of expert Mann's opinion was "later repudiated" by District. We disagree. District's zeal to reopen the case and add additional parties stemmed from a report by an expert it retained after it read Mann's report which "cast considerable doubt" upon the existence of any boundary between the Central and West sub-basins. District's new expert, Todd, opined there was no such barrier. In opposition to District's motion, a coauthor of the Mann report, by affidavit, stated that although a sharp boundary may not exist between the sub-basins, very little ground water migrates between the two sub-basins and there were sufficient differences between the two to consider their safe yields separately. He stated there was no new data in Todd's report which would lead one to conclude there is a substantial or even significant amount of water migrating between the Central and West sub-basins, or for adding the safe yield of the West sub-basin to the Central.

To say the experts' opinions at trial were conflicting is an understatement. Although they agreed on many criteria and used the same basic studies, Ellis' opinion was based on a period of 1938-1955 and Mann's, 1935-1973. Ellis' safe yield was 4,600 acre feet, Mann's, 3,410. After an exhaustive review of the record, we believe there is substantial evidence to support the trial court's determination of safe yield. Moreover, since the trial court retained jurisdiction, it has the power to redetermine safe yield in accordance with changed hydrologic condition, if necessary, either on remand or

in the future. (*City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 287.)

3. *Public Use and Civil Code Section 1007*

Appellants contend the trial court could not find a public use against them for the common benefit of the overlying lands and the inhabitants of the basin. ■ Intervention of a public use does not bar suit by the owner of a water right; it merely limits his remedy to damages in place of an injunction. (*City of Los Angeles* v. *City of Glendale* (1943) 23 Cal.2d 68, 80 [142 P.2d 289].) ■ The rights of a public utility regarding water which it exports to customers located outside the basin area, could not be overlying in character, but are either appropriative or prescriptive. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 927.)

■ Courts have recognized that the doctrine of intervention of public use to foreclose an injunction may be invoked on grounds of either equitable estoppel or public policy when public use has attached prior to the commencement of the action and depending upon the circumstances of a given case. (*Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351, 379; *Hillside Water Co.* v. *Los Angeles* (1938) 10 Cal.2d 677, 688 [76 P.2d 681].) The government may be bound by an equitable estoppel in the same manner as a private party when the requisite elements are present and when the resulting injustice from failure to apply it is of sufficient dimension to justify any effect upon public interest or policy. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].)

■ In the instant case, District could not assert an equitable estoppel against appellants for the same reason no prescription occurred. A party's taking under claim of right does not invade any other party's water rights in the basin so as to entitle the other party to injunctive relief or start the running of any prescriptive period against the other party's rights so long as the taking is only from a surplus of basin water, i.e., so long as the basin is not in overdraft. (*City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 282.) Here, the basin was not in overdraft until after the action was filed. Moreover, appellants' cooperation in or knowledge of District's taking water for a public purpose does not equate with knowledge that their individual overlying rights to ground water were in jeopardy.

■ Thus, any finding in favor of District must be based upon public policy grounds. However, those grounds are limited by Civil Code section 1007 which provides in part that ". . . no possession by any person, firm or corporation no matter how long continued of any land, water, *water right,* easement, or other property whatsoever dedicated to a public use by

a public utility, or dedicated to or owned by the state or any public entity, shall ever ripen into any title, interest or right against the owner thereof." (Italics added.)

The California Supreme Court has construed the word "person" in that provision to include governmental agencies. (*City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 277.) Furthermore, "possession" as used in section 1007 refers to "whatever use, control, or similar conduct would lay the foundation for a prescriptive right in the absence of any restriction." (*Id.,* at p. 272, fn. 69.) Additionally, section 1007, as amended in 1935, extends to all property of the specified governmental entities, whether or not devoted to public uses. (*Id.,* at p. 276.)

District argues that section 1007 only prevents acquisition of "title by prescription," not prohibition by public use. We disagree and suggest the plain language of that section belies District's contention.[5] ■ Intervention of public use may be a defense to a requested injunction, but constitutes "inverse" or "reverse" condemnation for which damages lie. (Cf. *Katz* v. *Walkinshaw, supra,* 141 Cal. at p. 136; *Hillside Water Co.* v. *City of Los Angeles, supra,* 10 Cal.2d 677.) It is sophistic to argue such use is not adverse.

We leave to the trial court's determination on remand whether District has established a public use against private landowners, as opposed to public entities or utilities.[6]

### 4. *La Cumbre*

At trial, La Cumbre never contended it had priority over the other appellants, only that it was a prior appropriator to District. On appeal, La Cumbre changed from a crawl to a backstroke. It now joins District in urging application of *Long Valley* (presumably because the judgment also appears to give La Cumbre priority over nonusing overlying owners) and further contends that if this court finds an intervening public use for public policy reasons, it must declare such an intervening public use in favor of La Cumbre as well as District. ■ A party is not permitted to change its position and adopt a new and different theory on appeal. (*Signal Hill Aviation Co.* v. *Stroppe* (1979) 96 Cal.App.3d 627, 638 [158 Cal.Rptr. 178]; see also *Orange County Water Dist.* v. *City of Colton, supra,* 226

---

[5]Because of our discussion of section 1007, it is unnecessary to address the effect of Water Code sections 106.5 and 1203.

[6]The parties stipulated, and the court found, that Pacific's use of ground water from its well constituted a dedication to public use by a public utility within the meaning of Civil Code section 1007.

Cal.App.2d 642, 649.) La Cumbre argues that this principle does not apply to questions of law. Since we are remanding that issue of public use to the trial court, La Cumbre can make its argument in that forum.

La Cumbre's right, as it conceded at trial, is that of an appropriator who must yield to rights of overlying owners in the event of a shortage. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926.) Since La Cumbre did not propound its theory of public use at trial, the only relief the trial court could grant it is to declare its right senior to that of District.

5. *Quantification*

District argues that the trial court should have based its allocations on the amount of extractions at time safe yield was first exceeded rather than when suit was filed. The trial court had apparently used that date since District's posttrial brief indicated that measurement of rights in public use cases is determined by reference to the amount of water extracted for some period of time before the date of filing suit and that mere intention to extract water in the future creates no rights. (*Turner* v. *East Side Canal etc. Co.* (1915) 169 Cal. 652 [147 P. 579].) The trial court has broad equitable powers in these matters and could well have concluded that using the date overdraft commenced would reward District for winning the "race to the pumphouse."

District contends that if its rights are subordinate to overlying landowners and it must make contemporaneous cutbacks as landowners' extractions may increase, the burden of the cutbacks should be shared equally with La Cumbre, the other appropriator. It arrives at the startling conclusion that since District was the first of the two appropriators to use more than two-thirds of the surplus supply, "logic and precedent dictate that any reductions should be made so that the remaining surplus is allocated in the same proportion as the parties were taking when the safe yield was fully utilized." We disagree.

Traditionally, as between appropriators, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926.) In *City of Pasadena* v. *City of Alhambra,* the Supreme Court upheld the trial court's *pro tanto* reduction between public agency water suppliers who were all appropriators and all had been extracting for many years after overdraft commenced. The court fashioned the doctrine of mutual prescriptive rights based on the highest continuous annual production of water for beneficial use in any five-year period subsequent to commence-

ment of overdraft and prior to the filing of the complaint. (*Id.*, at pp. 926-927.) This pragmatic narrow solution avoided application of correlative rights where there were well-established appropriators whose rights might be terminated. (*Forging the New Water Law: Public Regulation of "Proprietary" Rights, op. cit. supra,* p. 911.) Here, there was no overdraft until District increased its extractions with its new wells.

In *City of Los Angeles* v. *City of San Fernando, supra,* the Supreme Court rejected the mutual prescriptive doctrine as not necessarily resulting in the most equitable apportionment of water according to need. (14 Cal.3d at p. 265.) There, as here, none of the parties commenced their uses of ground waters after the years in which the trial court found overdraft to have begun. (*Id.*, at p. 266.) Instead, the Supreme Court suggested the trial court should consider the possibility of a physical solution, using its broad equitable powers. (*Id.*, at pp. 290-291.)

The trial court herein fashioned a novel solution of setting a base figure of 1,103 acre feet which District had a right to use and giving it the right to use the surplus until overlying landowners' uses necessitated a reduction. La Cumbre was not compelled to share in the reduction; neither was it given a right to increase extraction. The trial court's solution was in keeping with its duty to fix the quantity required by each user for its actual reasonable use. (*Tulare* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.3d at pp. 524-529.) It confirmed La Cumbre's position as senior appropriator but it retained jurisdiction to order equitable adjustments, if necessary.

However, we agree with District that the five-year average applicable to prescriptive rights is inappropriate where there was no overdraft at the time of filing suit. Since the suit was filed in mid-water year, it would appear more equitable to use the prior complete water year figure where usage was, on the whole, increasing. (See *County of Inyo* v. *City of Los Angeles* (1976) 61 Cal.App.3d 91, 96-98 [132 Cal.Rptr. 167].)

On remand, the trial court should keep in mind that a potential water user does not possess an absolute right to be treated in the same manner as existing water consumers within a water district and nonuser overlying owners are still subject to the moratorium. (*Hollister Park Inv. Co.* v. *Goleta County Water Dist.* (1978) 82 Cal.App.3d 290, 294 [147 Cal.Rptr. 91].) We note that the trial court neglected to fix the amount of water allocated to La Cumbre. The trial court should rectify that omission on retrial. The trial court may take any additional evidence it deems necessary on the parties' water usage or on changed hydrologic conditions due to the passage of time since the suit was filed in order to arrive at an equitable solution.

The judgment is reversed and remanded for further proceedings consistent with this opinion. Each party to bear its own costs on appeal.

Gilbert, J., and Abbe, J., concurred.

A petition for a rehearing was denied December 3, 1985. Abbe, J., was of the opinion that the petition should be granted. The petition of appellant Goleta Water District for review by the Supreme Court was denied March 12, 1986.